Mark Gelazela

13805098

2512 Baltimore Pike

Hanover, PA 17331

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

MARK GELAZELA,

        Plaintiff,

vs.

UNITED STATES OF AMERICA, et al.,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

Case No. 1:21-CV-01499-AWI-EPG

SECOND AMENDED COMPLAINT FOR DAMAGES

JURY TRIAL DEMANDED

## A.  JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to 28 U.S.C § 1331; <u>Bivens v. Six Unknown Federal Narcotics Agents</u>, 403 U.S. 388 (1971) and the FTCA.

2. Institution where the violation occurred: Mendota Federal Correctional Institute.

## B.  DEFENDANTS/PARTIES

1. UNITED STATES OF AMERICA may be served with process by service upon its registered agent at Office of the United States Attorney Civil Process Clerk, 2500 Tulare Street, Suite 4401 Fresno, CA 93721.

2. DR. THOMAS MOORE (hereinafter "Moore") is an individual who is currently, and was at all relevant times herein, a resident of the State of California, County of Fresno and the Doctor at Mendota FCI.

3. WARDEN DOUGLAS WHITE (hereinafter "White") is an individual who was at all relevant times herein, a resident of the State of California, County of Fresno and the former Warden at Mendota FCI.

4. CMC D. BLOCHER (hereinafter "Blocher") is an individual who is currently, and was at all relevant times herein, a resident of the State of California, County of Fresno and the CMC at Mendota FCI.

5. ACTING WARDEN C. LEPE (hereinafter "Lepe") is an individual who was, at all relevant times herein, a resident of the State of California, County of Fresno and the former acting Warden at Mendota FCI.

6. CASE MANAGER K. LEHMAN (hereinafter "Lehman") is an individual who is currently, and was at all relevant times herein, a resident of the State of California, County of Fresno and a case manager at Mendota FCI.

7. CO ALCANTOR, correctional officer (hereinafter "Alcantor") is an individual who is currently, and was at all relevant times herein, a resident of the State of California, County of Fresno and a Correctional Officer at FCI Mendota.

8. MENDOTA FCI exists by virtue of the laws of the United States, and may be served with process by service upon its registered agent at Mendota FCI, P.O. Box 39, Mendota CA, 93640.

9. BUREAU OF PRISONS exists by virtue of the laws of the United States, and may be served with process by service upon its registered agent at General Counsel, 320 First Street, NW, Washington, DC 20534.

**C.  RELATED CASES**

1.    MARK GELAZELA v. SANTA ANA PD et al. case number SA-CV-21-1126-JWH (DFM)

**D.  INTRODUCTION**

1.  Your Honor, thank you for continuing to allow the opportunity for revising this complaint. In the interest of keeping this filing under 25 Pages, the Plaintiff is not resubmitting all the evidentiary enclosures but will provide them during discovery and trial.  That being said, please

1  do not then dismiss this complaint due to "lack of factual evidence", as the Plaintiff is simply

2  trying to abide by the Court's rules to keep initial filing equitable.

3        Regarding the Court's mention of this being several possible different actions, the

4  Plaintiff is filing this as one complaint because he has had it happen in the past that the Court

5  system eventually combined multiple actions relating the same issues into one action due to an

6  excessive burden on the court system, tax payer's money and the "court's calendar" (this is what

7  happened in the Plaintiff's criminal case), and moreover, the Plaintiff is indeed motioning that all

8  these Defendants be "joined in one action as defendants for: (A) any right to relief is asserted

9  against them jointly, severally, or in the alternative with respect to or arising out of the same

10  transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or

11  fact common to all defendants will arise in the action."); Coughlin v. Rogers, 130 F.3d 1348,

12  1350 (9th Cir. 1997) ("[T]he 'same transaction' requirement[] refers to similarity in the factual

13  background of a claim.").  Additionally, given the applicability under the FTCA for violation of

14  "Common Law Torts", all of the Defendants are liable as one entity in some capacity as

15  transmuted to the "United States of America".

16        Given that the Plaintiff is proceeding "in forma pauperis", the Plaintiff humbly requests

17  under Rule 4 that the Court provides "service" for the attached summons to each Defendant.

18  Thank you for allowing the opportunity to amend this complaint, and should the Court determine

19  that there are additional items in this complaint that are amendable to allow for the maximum

20  possible chance of proceeding forward to hold the Defendants involved accountable for their

21  immoral, lawless and egregious actions, please graciously consider providing the Plaintiff an

22  additional opportunity to amend this complaint as well, Your Honor.

23        That not-withstanding, consider that pleadings of *pro se* plaintiffs "must be held to less

24  stringent standards than formal pleadings drafted by lawyers." Hebbe v. Pliler, 627 F.3d 338, 342

25  (9th Cir. 2010) (holding that *pro se* complaints should continue to be liberally construed after

26  Iqbal), and in keeping with Karim-Panahi v. L.A. Police Dep't, 839 F.2d 621, 623 (9th Cir.

27  1988), please "construe the pleadings liberally and...afford [the] plaintiff the benefit of any

28  doubt" and hold this pro se complaint to a less stringent standard in not recommending dismissal

1   (Childress v. Northrop Corp., 618 F. Supp. 44, 55 A.F.T.R.2d (RIA) 690 (DC Dist Col 1985)),

2   and last, do not dismiss this claim because a pro se Plaintiff has failed to set forth a complete

3   legal theory supporting the claim alleged (see Johnson, 135 S. Ct. at 346 [noting that the Fed.

4   rules of Civ. Proc. "do not countenance dismissal of a complaint for imperfect statement of the

5   legal theory supporting the claim asserted"]).

6

7   2.      The Plaintiff submits this complaint against the United States of America due to the

8   actions/negligence of the Bureau of Prisons (BOP), Mendota FCI, the named BOP and Mendota

9   FCI employees.  The Plaintiff requests that the United States' "sovereign immunity" be

10  unequivocally waived **given its violation of "common law torts"** per the enclosed legal

11  citations of 28 U.S.C. §1346 Federal Torts Claim Act (FTCA) and others (see also Murray v

12  United States, 686 F .2d 1320, 50 A.F .T.R.2d (RIA) 5612 (CAB) ND 1982) and (Sosa v.

13  Alverez Machain, 542 U.S. 692, 700 (2004)). The "United States, not responsible agency or

14  employee, is proper party defendant" in "official capacity" Federal Tort Claims Act suits.

15          To be clear, the Plaintiff brings this complaint against the United States of America for its

16  violation of "common law torts" (not for "constitutional tort claims"), per the above (and

17  enclosed) citation(s), e.g., "torts involving bodily harm…or negligence…", "for…personal

18  injury…caused by the negligent or wrongful act or omission of any employee of the Government

19  while acting within the scope of his office or employment…"  However, given that the law of the

20  forum state controls FTCA cases (28 U.S.C. § 1346(b)(1)), and therefore, the legal theory against

21  the United States must be grounded in existing state tort law (see *U.S. v. Olson* (2005) 546 U.S.

22  43, 45-47.), the Plaintiff also cites the U.S.'s violation of torts under the authorities of the

23  California Tort Claims Act (CTCA) §810-996.6 regarding his claims.  Specifically, the United

24  States of America is liable for violation of intentional torts (including personal injury/assault and

25  battery/infliction of emotional distress) where the Defendants who committed the wrongs should

26  have known they are wrong, whether they are through someone's action or failure to act:

27  negligent torts (including medical) where there was duty, breach, causation and damages and

28  where the Defendants should have known their actions or lack of actions were wrong, but failed

to curb those actions: and strict liability torts where the specific action(s) of the Defendants resulted in damage.  Moreover, all these acts or omissions were committed during the course and scope of employment (CTCA §950.2).

"Injury" means death, injury to a person, damage to or loss of property, or any other injury that a person may suffer to his person, reputation, character, feelings or estate, of such nature that it would be actionable if inflicted by a private person (CTCA §810.8).  Under CTCA §815.2, "a public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative" (see also §820.2 *Id.*).

The California Legislature has recognized that the imposition of vicarious liability on a public employer is an appropriate method to ensure that victims of police/officer misconduct are compensated. It has done so by declining to grant immunity to public entities when their officers engage in violent conduct. Since the enactment of the CTCA in 1963 (§ 810 et seq.), a governmental entity can be held vicariously liable when an officer acting in the course and scope of employment uses excessive force or engages in assaultive conduct. (City of Los Angeles v. Superior Court (1973) 33 Cal.App.3d 778, 782, 109 Cal.Rptr. 365; Larson v. City of Oakland (1971) 17 Cal.App.3d 91, 98, 94 Cal.Rptr. 466; Scruggs v. Haynes (1967) 252 Cal.App.2d 256, 268, 60 Cal.Rptr. 355; Griffith v. City of Monrovia (1982) 134 Cal.App.3d Supp. 6, 184 Cal.Rptr. 709; see also Jones v. City of Los Angeles (1963) 215 Cal.App.2d 155, 30 Cal.Rptr. 124.)  The decisions cited have recognized, at least implicitly, that vicarious liability is an appropriate method to ensure that victims of police/officer misconduct are compensated.

3.     The Plaintiff brings these claims against BOP/Mendota FCI employees Dr. Thomas Moore, Warden Douglas White, Former acting Warden C. Lepe, CMC D. Blocher, Case Manager K. Lehman and Officer Alcantor, in their personal capacity under "Bivens" for their specifically egregious actions/negligence as described herein in violation of the Plaintiff's

constitutional rights. They each through their "own individual actions, has violated the Constitution" (Iqbal, 556 U.S. at 676).

### E.  FACTS

1.      The Plaintiff was fully exonerated in court of any wrongdoing in his criminal case, but unfortunately, this exoneration occurred after the verdict so this did not prevent the Plaintiff from being wrongfully incarcerated pending appeal for a new trial under "rule 33".  The Plaintiff was "fresh" off crutches after surgery and wearing a full metal leg-brace to lock his knee in place when he was remanded into custody without warning.  The parties involved in the related case referenced above willfully re-damaged the Plaintiff's surgical repair when "indoctrinating" him.

Upon eventually arriving at Mendota FCI, the Plaintiff explained this to Moore, the only physician at Mendota FCI, and Moore accused the Plaintiff of faking his injury.  The Plaintiff is a 50% service-connected, disabled Marine Corps veteran (at the time, now 70% due to reevaluation after the further damage from the neglect and actions of the Defendants described herein) who served honorably for ten years, so his knee issue is well documented, to include being documented by those in the criminal administration system prior to the Plaintiff arriving at Mendota FCI.  Additionally, the Plaintiff arrived still in a complex, full length, metal knee brace, as he was only six weeks post-surgery, and Plaintiff not only had the internal knee pictures from the actual knee surgery with him but also had a copy of a letter from his world-renown, high-profile surgeon describing the surgery and the Plaintiff's tender physical condition and that his motion should be strictly limited, so it is unclear why Moore took the approach he did.

Over the course of the next year and a half, Moore willfully neglected to give any care to the Plaintiff's knee.  He refused to put him on limited duty status, ignored the Plaintiff's requests to be sent out for an MRI to "re-prove", per Moore's mandate, that the Plaintiff's knee was indeed reinjured, and he refused to issue the necessary form for the Plaintiff to receive (via the mail) his additional form-fitting, specialized knee brace that was supposed to replace his old knee brace after three months per his surgeon's orders.  Moore refused to issue even something as simple as ibuprofen.

Because he refused, the Plaintiff had no choice but to send the brace in anyway but to "unit team", hoping they would exercise clemency where Moore would not, but the brace (which was sent by certified mail) was thrown in the trash by the mail room (Officer Goodrich, the mail room officer, said that it was returned, but it was never received back, nor is there any record of it being returned).

After literally dozens of Medical "cop-outs" requesting care and other administrative actions, the Plaintiff did not receive an MRI and the results of the MRI until May and June of 2021 respectively, a year and a half after being incarcerated.  The MRI and imaging results showed that the Plaintiff's knee was indeed reinjured of course and, in addition to the fully torn ACL and both meniscus being torn, it also showed there was/is a fluid cyst that formed, and it is pressing on the nerve, making the Plaintiff lose feeling in his leg and foot at the risk of amputation.  This is the result of being denied medical treatment for more than a year-and-a-half. The Plaintiff was refused "light duty" status by Moore until a year-and-two months after being incarcerated, so for all that time the Plaintiff was required to perform regular duties that certainly further damaged his knee which continued to deteriorate badly with lack of treatment and regular "work status".

Post-MRI, the Plaintiff was ***STILL*** denied any care for his condition until SIS (prison internal affairs) Lt. Ciscernos asked the Plaintiff if he had ever received any care post-MRI given SIS's involvement with the Plaintiff's well-documented complaints regarding Moore and the fact that the case had been elevated to Moore's "doctor superior" given his both willful and neglectful behavior, and the Plaintiff informed him "no".  Moore was finally forced to minimally issue the Plaintiff anti-inflammatories and pain-killers but just a month and a half before release (so a year and eight months after initial incarceration): too little, too late.  Given the long delay, the external doctor/radiologist that the Plaintiff was finally sent to noted that, were they even to try and schedule a surgery at that point, the Plaintiff would been released by the time it would occur.  The Plaintiff is now permanently crippled and is set up to receive another complex surgery on the "outside" due to the actions/inaction of the Defendants.

2.  The Plaintiff has a long and virulent history of upper respiratory infections (Bronchitis, walking pneumonia, meningitis, etc.) and has had two parts of his immune system removed and so has a perpetually low white blood cell count.  Lehman, flatly refused to even accept the Plaintiff's BP-8, CARES Act release package, and Military and VA medical records until after the Plaintiff complained to the Warden in documented email.  The Plaintiff's requests to receive his own Mendota medical records were ignored for months also.

All these delays caused the Plaintiff to remain incarcerated, get COVID, and almost die (as well as contribute to the further permanent crippling of his knee due to delaying medical treatment even further that could have been received easily once released).  Had Mrs. Lehman not repeatedly refused his package, the Plaintiff would have been released to the safety of Home Confinement before the massive COVID outbreak that occurred at the Mendota FCI camp on August 25th, 2021.  On either the 22nd or 23rd of August, Officer Galan admitted to an Inmate (Inmate X) while they were both in close quarters in his office that both his children had tested positive with COVID the previous day, and yet Officer Galan was at work.  Two days later, everyone started getting COVID, starting with Officer McGlaughlin, and the Plaintiff could see that inmates were also starting to get sick.  This happened at the same time as when the Plaintiff was finally called to go to mandatory quarantine for 21 days prior to release under the CARES Act.

The Plaintiff was put into his own cell in quarantine in a different building (C1) on the 26th of August, but on the 27th of August, a correctional officer, Alcantor, who worked the morning shift on the same day bought Inmate X who was also being released under the CARES ACT (the same Inmate X that Officer Galan had close contact with) into the Plaintiff's cell. Both the Plaintiff and Inmate X protested to Alcantor against him putting them into a cell together, as Inmate X had already been in quarantine for two days, and likewise the Plaintiff did not feel comfortable being in the same cell as Inmate X given his contact with Officer Galan and the outbreak.  Inmate X had been tested for COVID in quarantine the day before he was forced into the cell with the Plaintiff, but Inmate X had not received his results yet.  After being forced to "cell" together, the next day (August 27th), it was discovered that Inmate X's test came back

"positive" (he was eventually labeled "patient zero" for the outbreak), so they took both Inmate X and the Plaintiff to medical isolation and there tested the Plaintiff.  The Plaintiff was now "positive"—shocker!

The Plaintiff became symptomatic on Sunday the 29th, with the COVID also inducing "strep"; the Plaintiff almost died, could not eat food for three days, nor sleep; he lost a lot of weight, and the pain was so intense in his throat that he would wake up every time he even swallowed.  He wanted to go to the Hospital as he could also barely breathe (along with diarrhea, nausea and all the other COVID symptoms), but dared not ask for fear that he would have to stay at Mendota for an extended period and also given all the abuses there: that's very "telling".  The Plaintiff (and everyone else) were also denied showers during this outbreak for days at a time (sometimes as long as a week).

In addition to the needless and willful delays of the Plaintiff's justified release package submissions, if protocol had been followed by Alcantor, the Plaintiff would not have gotten COVID, as he would have remained alone in quarantine, and Inmate X would not have been put into the Plaintiff's cell until Inmate X's test results were verified as either positive or negative. The Outbreak spread like wildfire of course; and as a result, Mendota staff bought the ENTIRE CAMP over to the Quarantine unit (C1) were the Plaintiff was, so it then became one massive "isolation unit".  When one adds this to the pain the Plaintiff was already in because of his knee (the Plaintiff could never sleep more than an hour or two because of it), COVID became a truly harrowing and damaging experience.

Along these lines, Lehman willfully, and for no good reason, delayed the Plaintiff's CARES Act submission package, and if the Plaintiff had been released just a week sooner he could have avoided the outbreak entirely (she caused a delay of at least 2 months as seen in email dates to the Warden's office and the Warden's response almost two months later).

3. Acting Warden C. Lepe is the party who admitted to the Plaintiff via email that his first request for compassionate release in June of 2020 was "lost", asking the Plaintiff to resubmit three months later, which again, contributed to the Plaintiff contracting COVID and not being able to get his knee surgery before permanent damage occurred.

4. Warden Douglas White was the official in charge at the time of most of the events described herein, and the Plaintiff attempted to contact him several times through administrative channels and was ignored or dismissed.  Related to this, Blocher was answering the Warden's emails for him at one point (he admitted this to the Plaintiff directly), and Blocher also ignored, dismissed or worked actively to derail the Plaintiff's requests both directly and through the aforementioned emails.  It was not until the Plaintiff got other BOP employees to agree to testify to the truth about some of the corruption that acting Warden M. Lejeune (White had retired at that point) was "convinced" to force Lehman to allow the Plaintiff to finally submit his CARES Act package and attending Military/VA medical records.  **It should not have taken over a year for the Plaintiff's CARES Act package/"requests for release" to be even accepted for review**; the damages caused are irreparable.

5. Someone at Mendota also fraudulently back-dated a made-up denial to one of the Plaintiff's initial requests for compassionate release/Cares Act release to the Regional BOP, and the Plaintiff has the evidence to prove this.  The three aforementioned Mendota staff members have stated that they are willing to testify to this, as the Plaintiff was not the only one "fed up" with the corruption at Mendota FCI.  The Plaintiff believes that Blocher is the guilty party and will be subpoenaing additional paperwork for trial to show that he signed off on this backdating officially. This caused further delay in the Plaintiff's release, resulting in more damages physically, mentally and emotionally as outlined herein.

6. The Plaintiff was also denied the Eucharist for over a year and four months despite repeated pleadings, and he is a practicing Catholic who had been accepted to become a Priest before being wrongfully incarcerated for a crime he was fully exonerated of.

7. The Plaintiff's attempts to pursue legal action were knowingly subjugated at every opportunity, as inmates were continually denied access to the "law library", whereby making it impossible to construct any legal document with "citation".  Every time any one inmate would be caught with "contraband", Mendota staff would punish **everyone** by taking away their access to the legal law library (which was only available on computer), the chapel (they would close and lock it-what depriving someone of their faith has anything to do with someone else being found

with contraband is anyone's guess), and also shut off the TV's which were the only source of anti-recidivism activities ("ace courses" shown on TV) for application for Earned Time Credits (ETC's) for application under the 1st step act; Mendota FCI has no other programing available whatsoever. **This is wildly unconstitutional to de facto extend an inmate's time in prison because someone else he is not involved with violated policy**. This occurred often and the Plaintiff has documents showing his ignored complaints regarding this.

The staff was extremely uncooperative and deliberate in their denial of these rights: Lehman even refused to sign something as simple an "in Forma Pauperis" form even though the Plaintiff had shown her section 671.03(2) of the federal rules of criminal procedures which state, "if permission is sought to proceed in forma pauperis, the petitioner must also have the warden or other appropriate officer of the institution in which the petitioner is being held file a certificate setting forth the amount of money or securities on deposit to the petitioner's credit in any account in the institution".  As mentioned, she also refused to accept the Plaintiff's Cares act submission and BP-8, so the Plaintiff had to wait months for his complaint to reach the Warden. Additionally, the Plaintiff filed a 2241 in the Eastern District regarding these abuses, but they ultimately advised him to submit under a civil complaint instead, as they stated the reliefs the Plaintiff was requesting did not fall within the scope of a 2241.  However, in the interest of the Plaintiff's safety and medical condition, the Court did issue an Order forwarding the Plaintiff's issues for immediate attention back to the "litigation coordinator" at Mendota FCI (Court clerk verified that it was sent and received) who promptly ignored Order in keeping with their misconduct and subjugation of law process; this is all willful behavior by the staff at Mendota FCI.

8.  The entire camp population was moved "across the street" to the Mendota medium facility (unit C1) on April 22nd, 2020 in retribution for inmates exercising their administrative remedies but under the "guise" of COVID.  In the C1 unit, the ice machine didn't work (ice was helping subdue the Plaintiff's knee pain in the absence of medical care), the air conditioning didn't work more than 50% of the time, and the power to the building kept shutting off entirely, so the inmates just sat in what became dark sauna boxes in 120 degree desert heat because the

officers were tired of getting maintenance to come and reset the "breaker".  Several inmates passed out, and the inmates were only offered showers three times a week on top of this and were on lockdown 23 hours a day for no particular reason (none was given). This heat (lack of ice) and dormancy swelled the Plaintiff's knee to monstrous proportions while making it impossible to even try and "self-rehab".  It is also unclear how giving inmates less showers per week helps to stem the spread of COVID.  The Plaintiff and the other inmates stayed in these conditions for *three full months* during the hottest months of the year before returning to the camp in August of 2020.

When Taft private prison closed, 160 inmates were transferred to Mendota during the first height of the pandemic despite there being a "freeze" on inmate transfers, and **none of them** were tested for COVID before they shipped or when they arrived, and they were released into the general population at Mendota, needlessly exposing everyone.  On that note, until the outbreak mentioned above, not ONE SINGLE INMATE "in population" was ever tested for the virus at Mendota camp despite their website saying that they were "testing inmates every day"; this behavior is unconscionable.

What was most egregious was when the CDC finally came through to inspect Mendota sometime in mid-August of 2020, and two days before they arrived, the staff at Mendota "put on a show" that would have made "Cirque du Soliel" seem lame by comparison, suddenly putting up signs about the virus and how to cough, adding tape to designate social distancing, separating inmates in the dining hall by mandating that two chairs be left empty between each inmate, and suddenly much, much more.  Along with this (also two days before the inspection) the staff came through with Acting Warden M. Lejeune and, all at once, took thirty inmates to the SHU for no good reason just so that when the CDC came through the camp housing unit it would look like there was social distancing for those who were left. One inmate (Jake Jorgensen), was taken to the SHU solely for having nothing else other than a toilet paper roll on his desk (Mendota regularly failed to provide the inmates with any cleaning/sanitization gear in the housing unit).

This was such an obvious ploy to mask Mendota's neglect of following CDC guidelines in caring for inmates' health in the face of COVID, and this was shown clear when, on the day of

the inspection itself, the Mendota staff told the remaining inmates in the housing unit to "get scarce" for the day and gave no guidance what this meant, so more than forty inmates literally huddled by themselves (Plaintiff included) behind the scrap heap junk pile behind one of the warehouses until the Inspectors and Mendota staff were gone, whereupon the inmates took it upon themselves to return to the housing unit.  This made it impossible to expose Mendota staff violations/health concerns to the CDC staff.  They conveniently bought the 30 inmates back from the SHU a week later with no justification.

All of this is such obvious corruption, breech of protocol, safety and policy that it should concern everyone involved your Honor, and if they trusted the inmates enough to go to an "out of bounds" area on their own without any direction or supervision at all (given that there is nothing physically keeping them at the camp except an unguarded six foot chain-link fence with no "wire"), then there is no reason for the Mendota staff to work so deliberately at every step to subjugate the Plaintiff and other's genuine release applications to home confinement given their medical issues and increased susceptibility to the virus.

## F.  CLAIMS FOR RELIEF

**CLAIM I** *Deliberate indifference to medical needs*

The Plaintiff realleges and incorporates by reference Sections "D" and "E" above.  The Plaintiff had the right to receive proper and timely medical care, and the Plaintiff had the right to receive his VA appointed surgeon's proscribed medical device.  Moore willfully denied the Plaintiff the ability to receive this device by repeatedly willfully denying him the proper form (Plaintiff has multiple written evidence of this to present at trial). The device was sent anyway by certified mail and its reception by the Mendota Mail room is certifiable, and they willfully discarded it.  The lack of this device caused the Plaintiffs knee to continue to deteriorate.  Regarding all of the Defendants except the U.S., they violated the Plaintiff's rights under the 8th amendment, but as these are also violations of "Common Law Torts", the U.S. is liable under the FTCA via the CTCA (per enclosed and aforementioned citations).

1    There was a "deliberate indifference to serious medical needs." Jett v. Penner, 439 F.3d

2    1091, 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)).  Given the

3    Plaintiff's recent complex surgery, of which Moore was aware (it was documented in the

4    Plaintiffs BOP medical file), a "serious medical need" existed and Moore's "failure to treat a

5    prisoner's condition could result in further significant injury or the unnecessary and wanton

6    infliction of pain"

7    "The defendant's [Moore's] response to the need was deliberately indifferent." Id.

8    (quoting McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992)) (citation and internal

9    quotations marks omitted), overruled on other grounds by WMX Technologies v. Miller, 104

10   F.3d 1133 (9th Cir. 1997) *(en bane)*, as he deliberately denied the Plaintiff the necessary form,

11   accused him of faking his injury several times, and literally shouted the Plaintiff out of his office

12   when the Plaintiff asked for the form a second time in person; completely unprompted, Moore

13   stated "go ahead and sue me, but you're not getting the form; we are done here!"  If this isn't

14   "willful and deliberate" then it is hard to imagine what else is, and again the Plaintiff has a

15   plethora of written evidence to prove the "willful indifference" as well.

16   Moore knew of and disregarded "an *excessive risk to* inmate health and safety." Toguchi

17   v. Chung, 391 F.3d 13 1051, 1057 (9th Cir. 2004) (emphasis added) (citation and internal

18   quotation marks omitted) and showed "(a) a purposeful act or failure to respond to a prisoner's

19   pain or possible medical need and (b) harm caused by the indifference." ~ 439 F.3d at 1096

20   (citation omitted).   As mentioned, the eventual MRI showed that the Plaintiff was indeed very

21   injured, and was certainly in great pain, and this pain was expressed not only verbally but in

22   writing.  To establish a difference of opinion rising to the level of deliberate indifference, a

23   "plaintiff must show that the course of treatment the doctors chose was medically unacceptable

24   under the circumstances." Jackson v. Mcintosh, 90 F.3d 330, 332 (9th Cir. 1996).  Moore's

25   course of treatment (none) and not putting the Plaintiff on restricted duty, or allowing him to

26   receive his brace and denying him even anti-inflammatories and all of the aforementioned is

27   medically unacceptable by any reasonable standard, and again, the Plaintiff was and is a service-

28   connected, disabled veteran.  Moore's cold, callous and, at times, defiantly "hot" indifference

was a behavior he exercised not only with this Plaintiff but with others.  Despite SIS getting involved and reprimanding Moore, Moore continued to willfully deny the Plaintiff all of the aforementioned until about a month and a half before release (so over 1.5 years later).  To the Court, the Plaintiff has enough evidence to support this claim to fill its own volume that he is prepared to present in trial, so this claim is factual and cognizable.

Moore stated that he refused to give the Plaintiff any care until his medical conditions would be "re-proved" despite Moore already having the BOP's medical history for the Plaintiff showing that the Plaintiff had the medical problems his did (and despite the surgery pictures and surgeon letter), but in juxtapose, Moore then refused to send the Plaintiff out for an MRI despite the Plaintiff's repeated requests.  After a year and a half and getting SIS involved, Moore finally sent the Plaintiff out for an MRI but he annotated the incorrect knee on the authorization paperwork, so the MRI had to be rescheduled for months later.  Moore documented the incorrect knee on more than one occasion.  This is medical malpractice by any standard, and if he had not been so indifferent, maybe he could have been able to annotate the proper knee.

The Plaintiff cannot express in words the amount of constant excruciating physical, mental and emotional pain he was in the entire time he was at Mendota because of the lack of care for his knee.  The Plaintiff is now unable to retain work presently due to the permanent crippling, and his extremely deteriorated knee that is a result of going without any care for so long will also further delay his entrance into the Priesthood, as he now needs another even more complex surgery to try and lessen his permanent crippling.  The Plaintiff has a plethora of evidence supporting this claim and everything referenced.  White, Lepe, Lehamn, Mendota FCI, the BOP, Blocker and the United States are all party to this claim (the U.S. for its violation of "common law torts" under the FTCA/CTCA and the other Defendants for violating the Plaintiff's constitutional rights), as they all had knowledge of the issues and willfully chose not to act on them until it was "too late" or engaged in/or were complicit in the abuse.

**CLAIM II:** Violations of the *Americans With Disabilities Act ("ADA') and Rehabilitation Act*

The Plaintiff realleges and incorporates by reference Sections "D" and "E" above. "Title II of the ADA and§ 504 of the RA both prohibit discrimination on the basis of disability. The ADA applies only to public entities, whereas the RA proscribes discrimination in all federally-funded programs." Lovell v. Chandler, 303 F.3d 1039, 1052 (9th Cir. 2002). "To establish a violation of Title II of the ADA, a plaintiff must show that (1) [he] is a qualified individual with a disability; (2) [he] was excluded from participation in or otherwise discriminated against with regard to a public entity's services, programs, or activities; and (3) such exclusion or discrimination was by reason of [his] disability." Lovell v. Chandler, 303 F.3d 1039, 1052 (9th Cir. 2002). "A plaintiff bringing suit under§ 504 [of the Rehabilitation Act] must show (1) he is an individual with a disability; (2) he is otherwise qualified to receive the benefit; (3) he was denied the benefits of the program solely by reason of his disability; and (4) the program receives federal financial assistance." Duvall v. Cty. of Kitsap, 260 F.3d 1124, 1135 (9th Cir. 2001), as amended on denial of reh'g (Oct. 11, 2001). "The term "disability" means, with respect to an individual-- (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(1)(A)-(C).

The Plaintiff has a well-documented record of the serious impairment (50% disabled at the time, now 70% due to the damages incurred at Mendota) and it "substantially limits one or more major life activities".  The surgeon who performed the surgery on the Plaintiff was appointed through the Veteran's Administration, a both a public and federally funded institution, and therefore the knee brace proscribed by the surgeon that was denied by Moore was a "benefit" he was "qualified to receive", and Moore's cantankerous, willful and deliberate denial was "intentional" and can be viewed as nothing less than denying the Plaintiff his "benefit" for no other reason than because he was disabled, thus qualifying as violations under both the aforementioned citations. "To recover monetary damages under Title II of the ADA or the Rehabilitation Act, a plaintiff must prove intentional discrimination on the part of the defendant." Duvall, 260 F.3d at 1138 (footnote omitted).  Deliberate indifference is the appropriate standard to apply in determining whether intentional discrimination occurred. Id. "Deliberate indifference

1   requires both knowledge that a harm to a federally protected right is substantially likely, and a
2   failure to act upon that likelihood." Id. at 1139. "[I]n order to meet the second element of the
3   deliberate indifference test, a failure to act must be the result of conduct that is more than
4   negligent, and involves an element of deliberateness." Id. Moore's deliberate behavior is truly
5   "cruel and unusual" and is also a violation of Common Law Torts and the Plaintiff rights under
6   the constitution.  White, Lepe, Lehamn, Mendota FCI, the BOP, Blocker and the United States
7   are all also party to this claim (the U.S. for its violation of "common law torts" under the
8   FTCA/CTCA and the other Defendants for violating the Plaintiff's constitutional rights), as they
9   all had knowledge of the issues and willfully chose not to act on them or participated in the
10  abuse.

11

12  **CLAIM III**: *Free Exercise of Religion*

13          The Plaintiff realleges and incorporates by reference Sections "D" and "E" above.  The
14  Supreme Court has repeatedly held that prisoners retain the protections of the First Amendment,
15  and although a prisoner's right to freely exercise his religion is "limited by institutional
16  objectives and by the loss of freedom concomitant with incarceration." Hartmann v. California
17  Dep't of Corr. & Rehab., 707 F.3d 1114, 1122 (9th Cir. 2013) (alteration in original) (citations
18  and internal quotation marks omitted), Mendota had no discernable institutional objective in
19  denying the Plaintiff the reception of the Eucharist from a year and five months.  Even when
20  there was a lull in COVID and the local parishes opened back up, Mendota still failed to provide
21  access to the Eucharist for the faithful either by a Lay Eucharistic Minister or priest.  Even in the
22  absence of a priest being able to come to Mendota and celebrate Mass, there was no reason
23  arrangements could not have been made for at least a Eucharistic minister to bring the Eucharist
24  to the faithful.

25          "'To ensure that courts afford appropriate deference to prison officials,' the Supreme
26  Court has directed that alleged infringements of prisoners' free exercise rights be 'judged under a
27  'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of
28  fundamental constitutional rights.'" Jones v. Williams, 791F.3d1023, 1032 (9th Cir. 2015)

(quoting O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987)). "The challenged conduct 'is valid if it is reasonably related to legitimate penological interests.'" Id. (quoting O'Lone, 482 U.S. at 349). Regarding the afore citations, all "reasonable" excuses fail given that Mendota and its staff failed to provide access to the Eucharist **for almost a year and a half**; no one can claim otherwise in the face of such a long absence.  Keep in mind that the Plaintiff was at a "camp", the most minimal security of all institutions, so neither can it be said that this lack of access to the Eucharist was for "security reasons."

"To merit protection under the free exercise clause of the First Amendment, a religious claim must satisfy two criteria. First, the claimant's proffered belief must be sincerely held; Second, the claim must be rooted in religious belief, not in purely secular philosophical concerns." Malik v. Brown, 16 F.3d 330, 333 (9th Cir. 1994) (alteration in original) (citations and internal quotation marks omitted), supplemented, 65 F.3d 148 (9th Cir. 1995); see also Shakur v. Schriro, 514 F.3d 878, 884-85 (9th Cir. 2008) (noting the Supreme Court's disapproval of the "centrality" test and finding that the "sincerity" test in Malik determines whether the Free Exercise Clause applies).  After COVID was first lifted, there was no reason to continue to deny the Plaintiff the Eucharist.  This was deliberate, and before the Plaintiff was wrongfully incarcerated, he was a daily mass communicant, and he had been accepted and was in the process of becoming a priest (Plaintiff has proof of this) and is now once again on his way to becoming a Catholic priest, so his "belief is sincerely held".

Additionally, "[a] person asserting a free exercise claim must show that the government action in question substantially burdens the person's practice of her religion." Jones, 791 F.3d at 1031. "A substantial burden ... place[s] more than an inconvenience on religious exercise; it must have a tendency to coerce individuals into acting contrary to their religious beliefs or exert substantial pressure on an adherent to modify his behavior and to violate his beliefs." Id. at 1031-32 (alterations in original) (citation and internal quotation marks omitted).  The Eucharist is central to the Catholic faith and the life of any Christian; in the words of Jesus, "Very truly, I tell you, unless you eat the flesh of the Son of Man and drink his blood, you have no life in you." (Jn 6:53).  This is not symbolic for Catholics, we, through transubstantiation, are receiving the actual

body and blood of Christ, so to deny this for almost a year and a half was a "substantial burden" and exerted "substantial pressure" on the Plaintiff "to modify his behavior and to violate his beliefs": to wit, Catholics are required to receive the Eucharist, at a bare minimum, on the six "Holy Days of Obligation" in the U.S.  To fail in this is was to cause him to "violate his beliefs." Given the Plaintiff's strongly held beliefs, this was extremely damaging, mentally, emotionally, spiritually and, yes, even physically, "you shall have not life within you".  White, Lepe, Lehman, Mendota FCI, the BOP, Blocker and the United states are all party to this claim (the U.S. for its violation of "common law torts" under the FTCA/CTCA and the other Defendants for violating the Plaintiff's constitutional rights), as they all had knowledge of the issues and willfully chose not to act or participated in the abuse despite the Plaintiff's repeated pleas.

**CLAIM IV**: *Access to Courts*

The Plaintiff realleges and incorporates by reference Sections "D" and "E" above.  Under the First and Fourteenth Amendments to the Constitution, inmates have a "'fundamental constitutional right of access to the courts.'" Lewis v. Casey, 518 U.S. 343, 346 (1996) (quoting Bounds v. Smith, 430 U.S. 817 (1977)); Phillips v. Hust, 477 F.3d 1070, 1075 (9th Cir. 2007), overruled on other grounds by Hust v. Phillips, *555* U.S. 1150 (2009). The Plaintiff suffered damages due to lack of access because it delayed the composure of his compassionate release package and delayed his CARES act submission due to unavailability to the law library (see Facts).  Additionally, it caused a delay in the civil complaint filing in the Related Case to the point that the Plaintiff had to submit for an extension, as he was not able to make that Court's deadline for reply because of lack of access to the Law Library and the delaying of the reception of the Plaintiff's legal mail. Lewis, 518 U.S. at 351-52; Vandelft v. Moses, 31 F.3d 794, 798 (9th Cir. 1994). The Plaintiff was prejudiced with respect to both contemplated and existing litigation, nor were any of these claims "frivolous".  Lewis, 518 U.S. at 349.   The Plaintiff was denied the necessary tools to litigate a non-frivolous criminal appeal, habeas petition, or civil rights action, Lewis, 518 U.S. at 353-55 & n.3; Christopher v. Harbury, 536 U.S. 403, 415 (2002). The Plaintiff was denied the ability to submit a proper rebuttal against the Government in his main

criminal appeal (no access to proper legal citations), and the denied access also caused the plaintiff's rebuttal against the Government in his Compassionate Release motion from reaching the District Court in time, so the judge ruled on the motion without the Plaintiff's rebuttal (which was finally docketed after the judge's ruling).  The Plaintiff has soooooo much evidence regarding all of these claims that are based in law that he will present in discovery and at trial, so they are not "frivolous", and are "factual" and "cognizable". Allen v. Sakai, 48 F.3d 1082, 1085 & n.12 (9th Cir. 1994). A claim "is frivolous where it lacks an arguable basis either in law or in fact." Neitzke v. Williams, 490 U.S. 319, 325 (1989), and even despite that, the Ninth Circuit has emphasized that "[a] prisoner need not show, ex post, that he would have been successful on the merits had his claim been considered. To hold otherwise would permit prison officials to substitute their judgment for the courts' and to interfere with a prisoner's right to court access on the chance that the prisoner's claim would eventually be deemed frivolous." Allen, 48 F.3d at 1091 (footnote omitted). White, Lepe, Lehman, Mendota FCI, the BOP, Blocker and the United States are all party to this claim (the U.S. for its violation of "common law torts" under the FTCA/CTCA and the other Defendants for violating the Plaintiff's constitutional rights), as they all had knowledge of, and willfully participated in the denial of access and subjugation of legal actions.

**CLAIM V**: *Due Process*

The Plaintiff realleges and incorporates by reference Sections "D" and "E" above.  The Due Process Clause of the Fourteenth Amendment protects prisoners from being deprived of life, liberty, or property without due process of law. Wolffv. McDonnell, 418 U.S. 539, *556* (1974). The procedural guarantees of the Fifth and Fourteenth Amendments' Due Process Clauses apply only when a constitutionally protected liberty or property interest is at stake. Ingraham v. Wright, 430 U.S. 651, 672-73 (1977).  The Plaintiff's was denied due process as set forth in this complaint.  White, Lepe, Lehman, Moore, Mendota FCI, the BOP, Blocker and the United states are all party to this claim (the U.S. for its violation of "common law torts" under the FTCA/CTCA and the other Defendants for violating the Plaintiff's constitutional rights), as they

all had knowledge of, and actively participated in the denial of due process as outlined in this complaint.

**CLAIM VI**: *Threat to Safety*

The Plaintiff realleges and incorporates by reference Sections "D" and "E" above. The Plaintiff was continually subjected to unsanitary and dangerous living conditions as outlined in this complaint, and as a result, the Plaintiff was needlessly exposed to COVID and his knee was needlessly further crippled. These are violations of both Common Law Torts under the FTCA and the 8th Amendment. Nor can it be argued that any of this was done for penal reasons, and if Mendota and its staff had provided more sanitary living conditions, maybe the outbreak would not have occurred and inmates like William Waller, a really good an noble man who was leading others to Christ, who perished from COVID just a week after the Plaintiff was finally released, would still be alive. The Plaintiff got extremely sick and almost died, and he was offered no care for his COVID infection; *no one was*; the medical staff came and took the inmate's pulse and temperature every couple of days.

His damages were physical, emotional and mental. Per the citations noted previously, a prison official may be held liable under the Eighth Amendment for acting with "deliberate indifference" to inmate health or safety if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. The staff was certainly aware that the power, AC, and ice were not working in the building C1 incident, and given that Mendota is in the middle of the desert and it was the height of the summer, there is no chance they can claim ignorance to the potential for harm. Prison officials have a duty under the Eighth Amendment to provide humane conditions of confinement. They must ensure that inmates receive adequate food, clothing, shelter, and medical care. The violations here are, objectively, "sufficiently serious," Wilson v. Seiter, 501 U. S. 294, 298, and the Mendota staff acted with "deliberate indifference" to inmate health or safety. Under the Due Process Clause of the Fourteenth Amendment (see Gordon v. Cty. of Orange, 888 F .3d 1118, 1124-25 (9th Cir, , 2?18)) the Plaintiff alleges that all of "(i) the defendant[s] made an intentional decision with

respect to the conditions under which the plaintiff was confined; (ii) those conditions put the

plaintiff at substantial risk of suffering serious harm; (iii) the defendant[s] did not take

reasonable available measures to abate that risk, even though a reasonable official in the

circumstances would have appreciated the high degree of risk involved--making the

consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the

defendant caused the plaintiff's injuries."  These were also violations of "Common Law Torts"

and so also fall under the FTCA/CTCA (see enclosed citations) ultimately holding the USA

responsible regarding "official capacity".  All Defendants are party to this claim, as they all had

knowledge of, and participated in threats to safety/abuse as outlined herein.

## G.  ADDITIONAL LEGAL REFERENCES

The Federal Tort Claims Act (FTCA) (28 USCS §§ 1346(b)(1), 2671 et seq.) removes the sovereign immunity of the United States for certain tort suits,

28 USCS § 1346(b) waives sovereign immunity of United States for claims resulting from negligent acts of employees only to extent that private person would be liable to claimant under law of place where act or omission occurs. Coe v. United States, 502 F. Supp. 881 (D. Or. 1980).

Federal Tort Claims Act is designed primarily to remove sovereign immunity of United States from suits in tort and, with certain specific exceptions, to render government liable in tort as private individual would be under like circumstances. Richards v. United States, 369 U.S. 1, 82 S. Ct. 585, 7 L. Ed. 2d 492 (1962)

Purpose of Federal Tort Claims Act is to compensate victims of negligence in conduct of governmental activities in circumstances like those in which private person would be liable and not to leave just treatment to caprice and legislative burden of individual private laws. Indian Towing Co. v. United States, 350 U.S. 61, 76 S. Ct. 122, 100 L. Ed. 48, 1956 A.M.C. 27 (1955).

Government's waiver of sovereign immunity under Federal Tort Claims Act is not restricted to circumstances in which governmental bodies have traditionally been responsible for misconduct of their employees, but extends to novel and unprecedented forms of liability as well. United States v. Muniz, 374 U.S. 150, 83 S. Ct. 1850, 10 L. Ed. 2d 805 (1963).

Purpose of Federal Tort Claims Act was to waive government's traditional all-encompassing immunity from tort actions and to establish novel and unprecedented governmental liability. Rayonier, Inc. v. United States, 352 U.S. 315, 77 S. Ct. 374, 1 L. Ed. 2d 354 (1957).

Purposes of Federal Tort Claims Act were to end injustice visited upon persons injured by torts of employees of United States, and left without remedy other than appeal to Congress, and to relieve Congress of burden of passing upon thousands of private claims presented to it. Aetna Casualty & Surety Co. v. United States, 170 F.2d 469 (2d Cir. 1948), aff'd, 338 U.S. 366, 70 S. Ct. 207, 94 L. Ed. 171 (1949).

Claims § 12.3 – Federal Tort Claims Act - types

6a, 6b. The Federal Tort Claims Act (28 USCS §§ 1346(b)(1), 2671 et seq.), in authorizing some suits against the Federal Government, was passed with "garden-variety" torts in mind, such as torts involving bodily harm, fraud, harm to property, or negligence in the operation of vehicles.

The FTCA renders the United States liable for tort claims "in the same manner and to the same extent as a private individual under like circumstances." 28 USC § 2674 [28 USCS § 2674]. The Act gives federal district courts "exclusive jurisdiction

United States, not responsible agency or employee, is proper party defendant in Federal Tort Claims Act suit. Galvin v. Occupational Safety & Health Admin., 860 F.2d 181, 12 Fed. R. Serv. 3d (Callaghan) 1498, 13 O.S.H. Cas. (BNA) 1960, 1988 O.S.H. Dec. (CCH) ¶28351 (5th Cir. 1988).

28 USCS § 2680(h) waived immunity whenever investigative or law enforcement officer committed one of specified intentional torts, regardless of whether officer was engaged in investigative or law enforcement activity. Ignacio v. United States, 674 F.3d 252 (4th Cir. 2012).

[542 US 752]

of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." § 1346(b)(1)

[542 US 706]

torts involving bodily harm is "the place where the harmful force takes effect upon the body" (emphasis in original)); ibid. (same principle for torts of fraud and torts involving harm to property).[4]

28 USCS § 1346(b) and (c) indicate that Congress intended ultimate monetary liability of United States for its torts to be determined in single action brought in federal court. Maltais v. United States, 439 F. Supp. 540, 25 Fed. R. Serv. 2d (Callaghan) 923 (N.D.N.Y. 1977).

The United States may not be sued without its consent and the existence of consent is a prerequisite for jurisdiction. Such consent may not be implied, but must be unequivocally expressed. The Federal Tort Claims Act (FTCA ) waives the United States' immunity as to certain common law torts, 28 U.S.C.S. §§ 1346(b)(1), 2679(b), but not constitutional tort claims.

[3]  The FTCA "was designed primarily <*pg. 734> to remove the sovereign immunity of the United States from suits in tort and, with certain specific exceptions, to render the Government liable in tort as a private individual would be under like circumstances." Richards v United States, 369 US 1, 6, 7 L Ed 2d 492, 82 S Ct 585 (1962); see also 28 USC § 2674 [28 USCS § 2674]. The Act accordingly gives federal district courts jurisdiction over claims against the United States for injury "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." § 1346(b)(1).

The Federal Torts Claim Act (FTCA), 28 U.S.C.S. § 1346(b) et seq., vests the district courts with exclusive jurisdiction of civil actions on claims against the United States for money damages for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment. The FTCA states that any other statute authorizing a federal agency to sue and be sued in its own name does not authorize an action against the agency which is cognizable under the tort claims provision. Instead, a suit against the United States under the FTCA is the exclusive remedy for tort claims arising from the actions of government agencies or employees. 28 U.S.C.S. § 2679(a).

(b) (1) Subject to the provisions of chapter 171 of this title [28 USCS §§ 2671 et seq.], the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

### H.  CLOSING

While at Mendota FCI, the Plaintiff exhausted all his administrative remedies by submitting a BP 8, 9, 10 and 11 up the BOP "chain of Command".  Despite the top sheet of the BP paperwork only mentioning the "compassionate release" on its face, the administrative remedies specified clearly all of these claims within them.  The Plaintiff also submitted an SF-95 to the regional BOP counsel (Administrative Claim No. TRT-WXR-2021-02085) regarding all these same issues; all were sent via certified mail (except the BP-8 which was handed directly to the "unit team), and the Plaintiff was given nothing but falsehoods, excuses and deferrals the entire way.

Given all that has been provided herein, these claims are cognizable, factual and are set forth in a way that the Defendants can "defend itself effectively"; therefore the Plaintiff is due a trial by jury for relief.  If it seems to the Court that this claim is copious, it is not because it is frivolous or "buckshot[ting]", it is because the abuses at Mendota are COPIUS, and again, the Plaintiff has _**volumes**_ of evidence to back up his claims.

Were it to come in front of a jury, the Plaintiff has NO DOUBT that they will find in favor of the Plaintiff given the neglect and multiple, egregious, willful and wanton abuses by the almost wholly corrupt staff at Mendota FCI.  These people are bad people your Honor, and they need to be held accountable.

And to your obvious thought, please remember that the Plaintiff was fully exonerated in court of any wrongdoing in his case (awaiting appeal due to the exoneration), so the Plaintiff is not a man of ill-character "pointing out a thorn in his neighbor's eye while ignoring the plank in his own."  Being convicted of a crime the Plaintiff did not commit, he has a singular perspective: he only sees those who are doing injustices while on "the inside", for he had no "criminal guilt" to dwell on.  Mendota staffs' corrupt, immoral and illegal behavior is in need of reprimand for the sake of those they needlessly abuse and neglect.

The plaintiff knows that the Court would not recommend dismissal for a legitimate complaint by a pro se plaintiff just because he inadvertently failed to live up to the rigid standard that falls outside of the purvey of a Pro Se Plaintiff, and please consider that the Plaintiff tried to

retain counsel for this case, and after going through over 30 attorneys' offices, the excuses were VAST and VAGUE, because no one wants to take a case on "contingency" against the U.S. Government who is known for needlessly dragging out civil cases to try and outlast the finances of the Plaintiff's attorneys.  To that end, the Plaintiff makes a plea to the Court for the appointment of legal counsel.

## I.   PRAYER FOR RELIEF

The Plaintiff is demanding monetary damages of ten million U.S. Dollars ($10,000,000.00) in reparation for all the actions mentioned in this complaint and the extreme physical, mental, spiritual, and emotional injuries suffered due to the same.  He is also asking for the censure of the named parties involved (especially Moore and Lehman) and reimbursement of legal fees to include, but not limited to, any fees required for the travel of witnesses. And any further relief as this Court may determine to be just and necessary.

The Plaintiff believes he is entitled to a trial by jury and is claiming so per Rule 38(b) of the Federal Rules of Civil Procedure.


I state that all of the forgoing statement are true and correct under penalty of perjury.


Oremus Pro Invicem,

Mark Gelazela

March 21, 2022

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of California ▼

|  |  |
|---|---|
| MARK GELAZELA | ) |
|  | ) |
|  | ) |
|  | ) |
| *Plaintiff(s)* | ) |
| v. | ) |
|  | ) |
| UNITED STATES OF AMERICA, THOMAS MOORE, | ) |
| DOUGLAS WHITE, D. BLOCHER, C. LEPE, K. | ) |
| LEHMAN, ALCANTOR, MENDOTA FCI, BUREAU | ) |
| OF PRISONS | ) |
| *Defendant(s)* | ) |

Civil Action No. 1:21-CV-01499-AWI-EPG

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

> Mr. Mark Gelazela
> 2512 Baltimore Pike
> Hanover, PA 17331

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No. 1:21-CV-01499-AWI-EPG

### PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.


Date: _____                _____
                                                      *Server's signature*

                                              _____
                                                      *Printed name and title*

                                              _____
                                                      *Server's address*

Additional information regarding attempted service, etc:

JS 44   (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

MARK GELAZELA

**DEFENDANTS**

UNITED STATES OF AMERICA, et al.

**(b)** County of Residence of First Listed Plaintiff   Hanover
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
N/A

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

☐ 1  U.S. Government Plaintiff
☒ 2  U.S. Government Defendant
☐ 3  Federal Question *(U.S. Government Not a Party)*
☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*   NOTE: Multiple Natures   Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☒ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from Another District *(specify)* ☐ 6 Multidistrict Litigation - Transfer ☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C § 1331; Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388 (1971)
Brief description of cause:
Violations of constitutional rights, common tort laws and the ADA and RA

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $ $10,000,000.00
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY**   *(See instructions):*
JUDGE   JWH (DFM)
DOCKET NUMBER   SA-CV-21-1126-JWH (DFM)

DATE   03/21/2022
SIGNATURE OF ATTORNEY OF RECORD   *Mark A. Gelazela*

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE