1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK GELAZELA,<br><br>               Plaintiff,<br><br>      v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>               Defendants. | Case No. 1:21-cv-01499-JLT-EPG (PC)<br><br>ORDER DENYING PLAINTIFF'S MOTIONS FOR LEAVE TO FILE SURREPLIES (ECF NOS. 55, 62)<br><br>AND<br><br>FINDINGS AND RECOMMENDATIONS TO:<br><br>  1) GRANT MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANT UNITED STATES OF AMERICA (ECF No. 48);<br><br>  2) GRANT MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANT THOMAS MOORE (ECF No. 58); AND<br><br>  3) DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF No. 45)<br><br>OBJECTIONS, IF ANY,<br>DUE WITHIN 30 DAYS |

Plaintiff Mark Gelazela is a former prisoner proceeding *pro se* and *in forma pauperis* in this action. This case proceeds on two claims: (1) Plaintiff's Eighth Amendment claim against Defendant Thomas Moore, M.D., for deliberate indifference to his serious medical needs, and

(2) Plaintiff's Federal Tort Claims Act (FTCA) claim against the United States based on the treatment Plaintiff received (or failed to receive) for his knee. (ECF Nos. 13, 20, 24).

On July 27, 2023, Plaintiff moved for summary judgment against all defendants. (ECF No. 45). On August 24, 2023, the United States moved for summary judgment. (ECF No. 48.) Finally, on February 22, 2024, Defendant Moore moved for summary judgment. (ECF No. 58). All three of these dispositive motions are now before the Court.

For the reasons stated below, the Court **DENIES** Plaintiff's motions for leave to file surreplies (ECF Nos. 55, 62) to Defendants' dispositive motions.

Additionally, the Court will recommend that the Motion for Summary Judgment filed by Defendant United States of America (ECF No. 48) be **GRANTED**. The Court will also recommend that Motion for Summary Judgment filed by Defendant Moore (ECF No. 58) be **GRANTED**. And, the Court will recommend that Plaintiff's Motion for Summary Judgment (ECF No. 45) with respect to these Defendants be **DENIED**.

## I.      BACKGROUND

Plaintiff commenced this action on October 8, 2021, while on home confinement after his release from the Bureau of Prison's (BOP) Federal Correctional Institution at Mendota (FCI Mendota). (*See* ECF No. 1 at 1, listing FCI Mendota FCI as Plaintiff's former address, and adding "now home confinement"). Plaintiff's complaint, as amended, alleged in relevant part that:

> [U]pon arriving at FCI Mendota, Plaintiff explained to
> defendant Moore that he recently had a surgery, and his knee
> was recently reinjured. Plaintiff also had a full metal leg-brace
> on his knee. Plaintiff also had a copy of a letter from his
> surgeon describing the surgery and Plaintiff's tender physical
> condition. Despite this, defendant Moore provided no care to
> Plaintiff for his knee. Moreover, after Plaintiff received an MRI,
> which showed that Plaintiff's knee was reinjured and that there
> was a fluid cyst that formed, defendant Moore still denied care.
> Defendant Moore finally provided some care after the case was
> elevated to his superiors.

(ECF No. 20 at 13; ECF No. 13 at 5–6). On March 22, 2022, the Court screened Plaintiff's amended complaint and recommended that the case proceed on Plaintiff's Eighth Amendment *Bivens* claim against Defendant Moore and his FTCA claim against the United States. (ECF No. 20). The district judge later adopted these findings and recommendations, allowing this action to proceed on these two claims. (ECF No. 24).

## II.   MOTIONS FOR SUMMARY JUDGMENT

### A.   Summary of Parties' Arguments

#### 1.   Plaintiff's Motion for Summary Judgment (ECF No. 45)

On July 17, 2023, Plaintiff filed Motion for Summary Judgment against both Defendants on both claims: the Eighth Amendment *Bivens* claim against Defendant Moore and the FTCA claim against the United States. (ECF No. 45). Plaintiff states that his motion was "based on the Plaintiff's Memorandum of Points and Authorities Supporting Motion for Summary Judgment Against All Defendants, the Plaintiff's Statement of Undisputed Facts and Conclusions of Law Supporting the Summary Judgment Motion Against All Defendants, the Declaration of Mark Gelazela (and the Exhibits attached thereto), the Answers of Thomas Moore and United States, and any additional evidence or argument that the Court may consider." (ECF No. 45 at 2). Plaintiff argues that "[t]he undisputed evidence establishes that Defendant Moore was deliberately indifferent to the Plaintiff's serious medical needs in violation of the Eighth Amendment and that Defendant United States of America stands in violation medical malpractice (negligence) under the Federal Tort Claims Act via the CTCA (California Tort Claims Act) based on the ill treatment the Plaintiff received (or needed treatment he failed to receive) on his knee which resulted in extreme physical, mental, spiritual, and emotional injuries (damages) suffered due to the same." (ECF No. 45 at 1).

Both Defendants opposed Plaintiff's motion. (ECF No. 49.) Defendant United States argues that summary judgment cannot be granted for Plaintiff on the medical malpractice claim under FTCA because expert testimony is required to establish the standard of care and to show causation. (ECF No. 49 at 7–8). Because Plaintiff has "provided the Court with no expert medical opinion as to the applicable standard of care, its breach, or as to the proximate

causation of any injury," the United States argues that Plaintiff's request for summary judgment on his FTCA claim fails for that reason. (*Id.* at 2). In addition, Defendant Moore argues that the Eighth Amendment imposes an even more stringent standard of proof on Plaintiff than mere malpractice, and that Plaintiff failed "to prove that Dr. Moore deliberately disregarded any excessive risk to [Plaintiff's] health." (*Id.*) Defendant Moore also argues that Plaintiff was treated, that delays in obtaining MRI were caused by the COVID pandemic, and that an error by Dr. Moore indicating the wrong knee on which to perform the MRI resulted in a delay of less than a month and that there is no evidence that this brief delay caused any injury. (*Id.* at 2, 11).

Along with their opposition, Defendants filed a response to Plaintiff's Statement of Undisputed Facts (ECF No. 49–1), as well as Declaration of Thomas Moore, M.D. (ECF No. 49–2), with accompanying Plaintiff's medical records enclosed as Attachment 1 to the Moore Declaration (ECF No. 49–2 at 11–61).

Plaintiff filed a Reply in support of his motion for summary judgment. (ECF No. 51). Plaintiff argues that Defendants "knew of and disregarded the risk in refusing to issue the plaintiff limited duty/passes when he was freshly off surgery, and it caused the plaintiff injury as outlined in his MSJ." (ECF No. 51 at 4). Plaintiff relies on the letter from his surgeon who did his ACL surgery on November 12, 2019 (ECF No. 45–5 at 39), to establish causation. (ECF No. 51 at 3–4).

**2.     Motion for Summary Judgment by the United States (ECF No. 48)**

On August 24, 2023, Defendant United States moved for summary judgment, arguing that Plaintiff's FTCA claim is barred as untimely by statute, 28 U.S.C. § 2401(b). (ECF No. 48.) The United States argues that the FTCA, 28 U.S.C. § 2675(a), requires that before an action may be commenced in court, the claimant must "present" his claim to the appropriate administrative agency for determination. 28 U.S.C. § 2675(a). (ECF No. 48–2 at 3–4). In addition, another FTCA provision—28 U.S.C. § 2401(b)—requires that "action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented." (ECF No. 48–2 at 4). The motion was

accompanied by notice to Plaintiff (ECF No. 48–1) required by *Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) and Statement of Undisputed Facts (ECF No. 48–3).

In support of its motion, the United States also filed sworn declarations of Jennifer Vickers, a paralegal at the BOP's Western Regional Office (ECF No. 48–4), and Devin Blocher, a Case Management Coordinator at FCI Mendota (ECF No. 48–5). In relevant part, these declarations and accompanying attachments show that Plaintiff presented his claim to BOP on January 11, 2021, and that "[b]y letter dated March 1, 2021, and mailed on March 8, 2021, via United States Postal Service Certified Mail, Return Receipt Requested (Certified Mail No. 701120000000 7357 6043), the BOP denied Plaintiff's administrative tort claim." (ECF No. 48–4 at 2, 112, 114). The United States argues that under 28 U.S.C. § 2401(b), Plaintiff had six months to bring FTCA claim from the date of mailing of the denial letter, i.e., six months from March 8, 2021, or until September 8, 2021. (ECF No. 48–2 at 4). Plaintiff, however, did not commence his suit until October 8, 2021, which is more than six months from the date of mailing by certified mail of final denial of Plaintiff's claim by the agency to which Plaintiff presented his claim. (ECF No. 48–2 at 4). Therefore, the United States argues, Plaintiff's FTCA claim is time barred by statute. (ECF No. 48–2 at 4 (citing 28 U.S.C. § 2401(b)).

Plaintiff opposed this motion. (ECF No. 50; *as amended by* ECF No. 53).[1] Plaintiff did not file any response to the United States' Statement of Undisputed Facts (ECF No. 48–3), as required by Local Rule 260(b). Plaintiff does not dispute that BOP mailed him the denial of his administrative tort claim on March 8, 2021 via certified mail, and that he failed to bring this action within six months of that date as required by FTCA. Instead, Plaintiff asks the Court to

---

[1] Initially, Plaintiff's Opposition (ECF No. 50) was not supported by a sworn declaration or filed under the penalty of perjury. After Defendant United States noted this omission in its Reply (ECF No. 52 at 5), Plaintiff filed "Errata To: Plaintiff's Opposition to Defendant's Motion for Summary Judgment" (ECF No. 53). Plaintiff stated that he inadvertently omitted the line "I state that all of the forgoing statement are true and correct under penalty of perjury" before his signature and asked the Court to consider the errata as a part of his Opposition (ECF No. 50), filed on August 26, 2023. Plaintiff is proceeding *pro se* and pleadings of *pro se* plaintiffs "must be held to less stringent standards than formal pleadings drafted by lawyers." *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010). Accordingly, the Court will treat Plaintiff's Opposition as filed under the penalty of perjury.

excuse the untimely filing under the disability provision in 28 U.S.C. § 2401(a) because he was physically disabled, as shown by his veteran's disability determination (ECF No. 50 at 4), and because he experienced impediments in filing the complaint (ECF No. 50 at 3–6).

In its Reply, the United States argued that 28 U.S.C. § 2401(a) does not apply here and that "[t]o the extent Plaintiff attempts to invoke the doctrine of equitable tolling, he has failed to prove either his own diligence or that an extraordinary circumstance prevented a timely filing." (ECF No. 52 at 1–2).

Plaintiff filed a Sur-Reply, without leave from the Court. (ECF No. 55).

### 3.      Motion for Summary Judgment by Defendant Moore (ECF No. 58)

On February 22, 2024, Defendant Moore moved for Summary Judgment (ECF No. 58). Defendant Moore argued that the Court should grant summary judgment in light of the Supreme Court's opinion in *Egbert v. Boule*, 596 U.S. 482 (2022), because Plaintiff's claim arises in a new context and Congress is better suited than the Judiciary to create a new remedy in damages. (*Id.* at 7, 12–21). Defendant Moore also argued that summary judgment is proper because the undisputed facts demonstrate that Plaintiff did not meet the Eighth Amendment standard. (*Id.* at 21–24). This motion was supported by the declaration of Defendant Dr. Moore and accompanying medical records (ECF No. 58–4), which appears nearly identical to the one filed with Defendants' opposition to Plaintiff's motion for the summary judgment. (ECF No. 49–2). Defendant Moore also filed a Statement of Undisputed Facts (ECF No. 58–3) and a *Rand* notice to Plaintiff (ECF No. 58–1).

Plaintiff opposed the motion (ECF No. 60), filing his response under the penalty of perjury (ECF No. 60 at 21), and also filed a response to Defendant's Statement of Undisputed Facts (ECF No. 60–1). Plaintiff argued that his claim does not arise in the new context.

Defendant Moore filed a short four-page reply (ECF No. 61), again arguing that Plaintiff cannot establish causation without an expert and that a letter by an unnamed surgeon cannot establish that causation, because "the letter does not address post-surgical 're-injury' caused by Santa Ana police before Gelazela ever arrived at FCI Mendota, does not mention Dr. Moore, and certainly does not establish to a reasonable medical probability that acts or

1   omissions of Dr. Moore were the actual and proximate cause of the injury that Gelazela

2   alleges." (ECF No. 61 at 3).

3         Plaintiff again filed a sur-reply, without leave from the Court. (ECF No. 62).

4   **B.      Legal standard**

5         A party may move for summary judgment on a claim or defense. Fed. R. Civ. P. 56(a).

6   Summary judgment in favor of a party is appropriate when there "is no genuine dispute as to

7   any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

8   56(a); *Albino v. Baca (Albino II)*, 747 F.3d 1162, 1169 (9th Cir. 2014) (en banc) ("If there is

9   a genuine dispute about material facts, summary judgment will not be granted."). A party

10  asserting that a fact cannot be disputed must support the assertion by "citing to particular parts

11  of materials in the record, including depositions, documents, electronically stored information,

12  affidavits or declarations, stipulations (including those made for purposes of the motion only),

13  admissions, interrogatory answers, or other materials, or showing that the materials cited do not

14  establish the absence or presence of a genuine dispute, or that an adverse party cannot produce

15  admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

16        A party moving for summary judgment "bears the initial responsibility of informing the

17  district court of the basis for its motion, and identifying those portions of 'the pleadings,

18  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

19  any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*

20  *Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). If the moving party

21  moves for summary judgment on the basis that a material fact lacks any proof, the Court must

22  determine whether a fair-minded jury could reasonably find for the non-moving party.

23  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla

24  of evidence in support of the plaintiff's position will be insufficient; there must be evidence on

25  which the jury could reasonably find for the plaintiff."). "[A] complete failure of proof

26  concerning an essential element of the nonmoving party's case necessarily renders all other

27  facts immaterial." *Celotex*, 477 U.S. at 322. Additionally, "[a] summary judgment motion

28

7

cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

In reviewing the evidence at the summary judgment stage, the Court "must draw all reasonable inferences in the light most favorable to the nonmoving party." *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011). It need only draw inferences, however, where there is "evidence in the record . . . from which a reasonable inference . . . may be drawn;" the court need not entertain inferences that are unsupported by fact. *Celotex*, 477 U.S. at 330 n. 2 (citation omitted). Additionally, "[t]he evidence of the non-movant is to be believed." *Anderson*, 477 U.S. at 255.

In reviewing a summary judgment motion, the Court may consider other materials in the record not cited to by the parties, but is not required to do so. Fed. R. Civ. P. 56(c)(3); *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).

**C.      Plaintiff's motions for leave to file surreply (ECF Nos. 55, 62)**

In addition to opposing Defendants' motions for summary judgement (ECF Nos. 50&53; 60), Plaintiff also filed surreplies to both motions, without obtaining leave of court. (ECF Nos. 55, 62). The Local Rules provide for a motion, an opposition, and a reply. L.R. 230(m). Neither the Local Rules nor the Federal Rules provide the right to file a surreply. A district court may allow a surreply to be filed, but only "where a valid reason for such additional briefing exists, such as where the movant raises new arguments in its reply brief." *Hill v. England*, 2005 WL 3031136, *1 (E.D. Cal. Nov. 8, 2005). This is not the case here.

District courts have the discretion to either permit or preclude a sur-reply. *See U.S. ex rel. Meyer v. Horizon Health Corp.*, 565 F.3d 1195, 1203 (9th Cir. 2009) (district court did not abuse discretion in refusing to permit "inequitable surreply"). To the extent Plaintiff's statement in his surreplies that he should be allowed to file a surreply because the motion is being submitted upon the record without oral argument (ECF No. 55 at 1, 62 at 1) can be construed as a motion for leave to file a surreply, Plaintiff's argument is unpersuasive. While courts in this Circuit are required to afford *pro se* litigants leniency, *see, e.g.*, *Wilhelm v. Rotman*, 680 F.3d 1113, 1121 (9th Cir. 2012); *Watison v. Carter*, 668 F.3d 1108, 1112 (9th Cir.

2012), this leniency, however, does not extend to permitting surreplies as a matter of course. *Garcia v. Biter*, 195 F. Supp. 3d 1131, 1134 (E.D. Cal. 2016). All *pro se* motions in prisoner actions in this Court are submitted upon the record without oral argument. L.R. 230(l). Moreover, Plaintiff himself requested that the motions be submitted without a hearing. (ECF No. 50 at 1; ECF No. 60 at 1).

Given the extensive briefing in this case on all three motions and lack of good cause, the Court **DENIES** Plaintiff's motions for leave to file surreplies (ECF Nos. 55, 62). Plaintiff's surreplies will not be considered.

**D.    Analysis of Motions for Summary Judgment**

**1.    Timeliness of FTCA claim**

The Court first addresses the argument that Plaintiff's FTCA claim is untimely because it is barred by statute, 28 U.S.C. § 2401(b). (ECF No. 48–2 at 1). The following relevant facts are undisputed:

- Plaintiff presented his administrative claim to BOP (ECF No. 48–4 at 4–108);
- BOP mailed Plaintiff via certified mail a notice that his claim was denied on March 8, 2021 (ECF No. 48–4 at 112, 114);
- This notice informed Plaintiff that he has "six months from the date of the mailing of this letter via certified mail within which to bring suit in the appropriate United States District Court" (ECF No. 48–4 at 112);
- Plaintiff was released from custody on September 14, 2021 (ECF No. 49–1 at 6, #33);
- Plaintiff's complaint in this action was filed on October 8, 2021 (*see* docket; ECF No. 45–2 at 16–17);

Thus, parties do not dispute that under 28 U.S.C. § 2401(b), an action needed to be filed within six months of the agency mailing the denial to Plaintiff via certified mail. Meaning, Plaintiff had to commence this suit by no later than September 8, 2021. This Court applies the six-month FTCA statute of limitations strictly. *See, e.g.*, *Wkly. v. United States*, No. 1:22-CV-00341-JLT-SAB, 2023 WL 6796428, at *7 (E.D. Cal. Oct. 13, 2023) (holding that plaintiff's FTCA claim filed six months and three days after the agency mailed its denial is "forever barred" by 28 U.S.C. § 2401(b)); *Alonzo v. United States*, No. 1:17-CV-539-LJO-SKO, 2017

WL 3264010, at *1 (E.D. Cal. Aug. 1, 2017) (holding that when plaintiffs filed their complaint six months and one day after the agency mailed its denial letter, the plaintiffs' claim was forever barred by the FTCA's statute of limitations). Therefore, absent tolling, the FTCA's six-month statute of limitations bars this action.

The parties dispute whether the tolling provision of 28 U.S.C. § 2401(a) applies to FTCA claims in general and to Plaintiff in particular because of his physical disability, as shown by his veteran's disability determination (ECF No. 50 at 4; ECF No. 52 at 2–3). Parties also dispute whether Plaintiff is entitled to equitable tolling (ECF No. 50 at 4–6; ECF No. 52 at 3–7). The Court addresses each argument in turn.

### a)   28 U.S.C. § 2401(a)

Title 28, Section 2401 provides, in its entirety:

> (a) Except as provided by chapter 71 of title 41, every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues. The action of any person under legal disability or beyond the seas at the time the claim accrues may be commenced within three years after the disability ceases.

> (b) A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

Citing *Booth v. United States*, 914 F.3d 1199, 1206 (9th Cir. 2019) and *United States v. Glenn*, 231 F.2d 884, 886 (9th Cir. 1956), the United States argues that § 2401(a) does not apply to the FTCA. (ECF No. 52 at 2). The United States further argues, citing *United States v. Ioane*, No. 1:09-cr-00142-LJO-03, 2019 WL 1332188, at *3 (E.D. Cal. Mar. 25, 2019), that "even if Section 2401(a) did apply to this action, it would not apply to Plaintiff, because the provision refers to mental incapacity, not physical limitations." (ECF No. 52 at 2–3).

The Court agrees. As the Ninth Circuit in *Booth* has held:

> *Glenn* noted that, although both § 2401(a) and § 2401(b) are
> now contained in the same statute, they did not begin that way.
> *See id.* Based on the legislative history of § 2401 and the
> sources of subsections (a) and (b), *Glenn* concluded that
> Congress did not intend "that the sentence in [§ 2401(a)]
> qualified the limitation on tort claims set forth in [§ 2401(b)]."
> *Id.*

*Booth*, 914 F.3d at 1206. The *Booth* court declined to overrule *Glenn*. It held that the tolling

provision of § 2401(a) applies to non-tort—meaning, non-FTCA—claims (*id.*) and observed

that the FTCA's statute of limitations, 28 U.S.C. § 2401(b), contains no tolling provision for

legal disability. *Booth*, 914 F.3d at 1205 (noting that "the FTCA began with a statute of

limitations that was 'without express qualification for legal disability,' and each time Congress

amended the limitation period, it did not add a tolling provision.") (quoting *Glenn*, 231 F.2d

884 at 886).

      Moreover, the Ninth Circuit emphasized the anomalous result if the Court were to apply

the interpretation of the statute urged by Plaintiff here:

> [A]pplying subsection (a)'s tolling provision to claims covered
> by subsection (b) would create an anomaly. Under that
> interpretation, a formerly disabled plaintiff would have three
> years to file an action after the disability ceases,
> notwithstanding subsection (b)'s requirement that such claims
> be filed with the agency within two years after the claim
> accrues. *Compare* 28 U.S.C. § 2401(a) ("The action of any
> person under legal disability or beyond the seas at the time the
> claim accrues may be commenced within three years after the
> disability ceases." (emphasis added)), *with id.* § 2401(b) ("A
> tort claim against the United States shall be forever barred
> unless it is presented in writing to the appropriate Federal
> agency within two years after such claim accrues . . . ."
> (emphasis added)). We can think of no reason Congress would
> have devised such a scheme.

*Booth*, 914 F.3d at 1206. For these reasons, *Booth* unequivocally rejected the argument made

by Plaintiff in this case: "We therefore reject Booth's argument that the tolling provision in

subsection (a) should apply to claims covered by subsection (b)." *Id.*

1    In addition, as this Court noted in *Ioane*, reference to disability in § 2401(a) is a
2  reference to *legal* disability such that it "renders the sufferer incapable of caring for his
3  property, of transacting business, of understanding the nature and effects of his [or her] acts,
4  and of comprehending his [or her] legal rights and liabilities." *Ioane*, No. 1:09-cr-00142-LJO-
5  03, 2019 WL 1332188, at \*3 (quoting *Shinogee v. Fanning*, 234 F. Supp. 3d 39, 43–44 (D.D.C.
6  2017)). There is no evidence that Plaintiff suffers from legal disability sufficient to toll the
7  statute of limitations period.

8    Accordingly, the Court rejects Plaintiff's arguments that 28 U.S.C. § 2401(a) tolling
9  provision applies to his FTCA claim and applies to Plaintiff because he is physically disabled.

10                 **b)  Equitable Tolling**

11    The six-month limitation period for filing an FTCA claim set by 28 U.S.C. § 2401(b) is
12  not jurisdictional and is subject to equitable tolling. *United States v. Kwai Fun Wong*, 575 U.S.
13  402, 405 (2015). To demonstrate equitable tolling, a plaintiff must show that (1) he has been
14  pursing his rights diligently, and (2) that some extraordinary circumstance stood in his way.
15  *Kwai Fun Wong v. Beebe*, 732 F.3d 1030, 1052 (9th Cir. 2013), *aff'd and remanded sub nom.*
16  *United States v. Wong*, 575 U.S. at 405. The standard is very high. *See Irwin v. Dep't of*
17  *Veterans Affairs*, 498 U.S. 89, 96 (1990) ("a garden variety claim of excusable neglect" is not
18  enough to show equitable tolling); *Nelmida v. Shelly Eurocars, Inc.*, 112 F.3d 380, 384–86 (9th
19  Cir. 1996) (affirming rejection of equitable tolling argument where plaintiff did not diligently
20  pursue her claim by filing suit on time). The burden is on the plaintiff to show that equitable
21  tolling is appropriate. *United States v. Marolf*, 173 F.3d 1213, 1218 n.3 (9th Cir. 1999).

22    Plaintiff argues that he is entitled to tolling because he was in quarantine for
23  coronavirus for a period of approximately three weeks, from August 26, 2021, to September 14,
24  2021; he was generally denied access to the law library; he was under extreme duress due to
25  lack of medical care and it was difficult to compose and file a complaint; and after he was
26  released to home confinement, he would have had to file for permission from his Supervised
27  Release officer to be allowed to even go the post office. The United States argues, "Plaintiff has
28  not alleged, let alone established, that he was diligent in preparing a federal lawsuit after he

received the BOP's denial letter, which explicitly advised Plaintiff that he had "six months from the date of the mailing of this letter via certified mail within which to bring suit in the appropriate United States District Court." (ECF No. 52 at 5–6).

The Court agrees that Plaintiff failed to make a showing that would entitle him to equitable tolling.

While Plaintiff has alleged that he needed to request a permission "from his Supervised Release officer to be allowed to even go the post office . . . to enact certified mail" (ECF No. 50 at 5), he has not alleged that this requirement created any appreciable delays. Defendant's point that evidence shows to the contrary (ECF No. 52 at 5) is well-taken. Emails attached to Plaintiff's response show that when Plaintiff emailed the officer with a request to extend the time to run his errands, he received a positive response within ten minutes. (ECF No. 50 at 7).

Further, as Defendant argues (ECF No. 52 at 6), Petitioner is not exempt from statutory deadline because he is proceeding *pro se* and because he was denied access to the library. The Ninth Circuit has clearly held that "a *pro se* petitioner's lack of legal sophistication is not, by itself, an extraordinary circumstance warranting equitable tolling," *Rasberry v. Garcia*, 448 F.3d 1150, 1154 (9th Cir. 2006), and "[o]rdinary prison limitations" do not constitute extraordinary circumstances, *see Ramirez v. Yates*, 571 F.3d 993, 998 (9th Cir. 2009) ("[o]rdinary prison limitations" on access to law library and copier not extraordinary, did not prevent timely filing, and "concluding otherwise would permit the exception to swallow the rule" considering "the most common day-to-day security restrictions in prison"); *see also United States v. Hornbuckle*, No. 2:11-CR-0327 DAD AC, 2024 WL 2302335, at *3 (E.D. Cal. May 21, 2024).

As to the argument that Plaintiff is entitled to tolling due to unspecified medical issues, there is no evidentiary support for this assertion, and the Court cannot conclude that such issues constituted an extraordinary circumstance preventing filing of the complaint.

Thus, even if Plaintiff's 3-week quarantine due were considered as a basis for tolling, Plaintiff's filing would still be untimely.

Plaintiff's argument that the Court should consider the date he mailed the complaint, September 29, 2021, rather than the date the Court received it as the date of filing is also not supported by the law. Generally, a civil action is commenced with filing of the complaint, and a document is considered to be filed on the date that the Clerk of Court receives it. *Carr v. Giron*, 752 F. App'x 434, 436 (9th Cir. 2018); *see also* Fed. R. Civ. P. 3 ("A civil action is commenced by filing a complaint with the court."); Fed. R. Civ. P. 5(d)(2) ("A paper not filed electronically is filed by delivering it: (A) to the clerk; . . ."); L.R. 134(a) (effective 2019, at the time of filing of Plaintiff's complaint) ("Paper filings, when permitted or required by these procedures, shall be complete upon presentation to the Clerk.").[2]

Finally, Plaintiff also argues that the Court should ignore the statute of limitations because "[i]t has always been the policy of the courts in California to resolve a dispute on the merits of the case rather than allowing a dismissal on technicality." (ECF No. 50 at 5). Yet equitable tolling doctrine is what reconciles "the policy underlying the statute of limitations, that is to prevent the assertion of stale claims and to give defendants timely notice of their potential liability, with the competing policy of avoiding technical and unjust forfeitures and favoring the resolution of claims on the merits." *Calderon v. United States*, No. 1:17-CV-0040-BAM, 2018 WL 5906064, at *4 (E.D. Cal. Nov. 9, 2018) (internal quotation marks and alterations omitted). Plaintiff has not established that he has met the requirements of equitable tolling doctrine, therefore, the policies underlying the statute of limitations prevail here.

Accordingly, the Court finds that (1) Plaintiff filed this lawsuit after the FTCA's six-month statute of limitations period, and (2) Plaintiff is not entitled to equitable tolling sufficient to save Plaintiff's untimeliness. As such, Plaintiff's FTCA claim is "forever barred," 28 U.S.C. § 2401(b). Thus, the Court will recommend that motion for summary judgment filed by the

---

[2] To the extent Plaintiff attempts to invoke a common-law mailbox rule, which provides that a document is deemed filed on the date it is given to prison officials for mailing, *Carr v. Giron*, 752 F. App'x 434, 436 (9th Cir. 2018), it does not apply to Plaintiff because he was released from custody on September 14, 2021, and thus was not a prisoner when he mailed the complaint.

1  Defendant the United States of America (ECF No. 48) be **GRANTED,** and summary judgment
2  entered in favor of the United States.

3          2.      **Availability of *Bivens* remedy**

4          Turning to Defendant Moore's motion for summary judgment regarding Plaintiff's
5  Eighth Amendment claim for deliberate indifference to serious medical needs, the parties
6  dispute whether *Bivens* remedy is available here. Defendant Moore argues that the Court should
7  grant summary judgment in light of *Egbert v. Boule*, 596 U.S. 482 (2022), because Plaintiff's
8  Eighth Amendment deliberate indifference claim arises in a new context and Congress is better
9  suited than the Judiciary to create a new remedy in damages. (ECF No. 58–2 at 7, 12–21).
10 Plaintiff disagrees. (ECF No. 60 at 11–16).

11         For the reasons stated below, the Court finds that Plaintiff's case does not differ in a
12 meaningful way from *Carlson v. Green*, 446 U.S. 14, 20 (1980), and that his *Bivens* claim may
13 proceed.

14         A *Bivens* action, the "federal analog to suits brought against state officials" under 42
15 U.S.C. § 1983, *Hartman v. Moore*, 547 U.S. 250, 254 n.2 (2006), is a judicially implied cause
16 of action "for damages against federal officers alleged to have violated a plaintiff's
17 constitutional rights," *Lanuza v. Love*, 899 F.3d 1019, 1021 (9th Cir. 2018). *See Ziglar v.*
18 *Abbasi*, 582 U.S. 120, 131 (2017).

19         In *Bivens v. Six Unknown Federal Narcotics Agents*, the Supreme Court held that a
20 violation of the Fourth Amendment by a federal agent acting under color of his authority gives
21 rise to a cause of action for damages. 403 U.S. at 389. The Supreme Court acknowledged that
22 "the Fourth Amendment does not in so many words provide for its enforcement by an award of
23 money damages for the consequences of its violation," but noted that there was "no explicit
24 congressional declaration that persons injured by a federal officer's violation of the Fourth
25 Amendment may not recover money damages from the agents" and that the "present case
26 involves no special factors counselling hesitation in the absence of affirmative action by
27 Congress." *Id.* at 396, 397.

28

15

Thereafter, in *Davis v. Passman*, 442 U.S. 228 (1979), the Supreme Court held that the plaintiff—an administrative assistant to a United States congressman who was fired because she was a woman—could sue for damages for a violation of the Due Process Clause of the Fifth Amendment. And in *Carlson v. Green*, 446 U.S. 14 (1980), the Supreme Court held that the estate of a prisoner could sue federal prison officials for damages for failure to adequately treat the prisoner's asthma in violation of the Eighth Amendment.

Since *Bivens*, *Davis*, and *Carlson* were decided, there has been a "notable change in the Court's approach to recognizing implied causes of action" such that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity," as evidenced by the Supreme Court "consistently refus[ing] to extend *Bivens* to any new context or new category of defendants" for the past thirty years. *Abbasi*, 582 U.S. at 135 (citations omitted). The Supreme Court has articulated the following two-part test for determining whether a *Bivens* remedy should be extended: "First, courts must determine whether the plaintiff is seeking a *Bivens* remedy in a new context. If the answer to this question is 'no,' then no further analysis is required. If the answer is 'yes,' then the court must determine whether 'special factors counsel[ ] hesitation.'" *Lanuza*, 899 F.3d at 1023 (citing *Abbasi*, 582 U.S. at 139–40).

In the case of *Stanard v. Dy*, 88 F.4th 811 (9th Cir. 2023), the Ninth Circuit applied this two-step analysis to a case, like this one, asserting deliberate indifference to medical needs. In *Stanard*, the prisoner plaintiff was denied any treatment for his Hepatitis C infection at a BOP facility for about eight months; he later received treatment after his transfer to a different facility. 88 F.4th 811 at 813–14. The Ninth Circuit agreed with the parties "that *Carlson* provide[d] the starting point for the 'new context' analysis," and the court summarized the facts of *Carlson* as follows:

> In *Carlson*, the Court recognized a *Bivens* remedy against prison officials who were deliberately indifferent to an inmate's asthma. 446 U.S. at 16 n.1, 100 S.Ct. 1468. Against the advice of doctors, the inmate was detained at a corrections facility with "gross[ly] inadequa[te]" medical facilities. *Id.* When he suffered an asthma attack, no doctor was on duty and none was called in. *See Green v. Carlson*, 581 F.2d 669, 671 (7th Cir. 1978).

16

> Instead, after some delay, a medical training assistant attempted
> to use a broken respirator on the inmate. *Id.* When the inmate
> pulled away from the respirator and told the assistant it was
> making his breathing worse, the assistant administered an
> antipsychotic medication. *See id.* The inmate went into
> respiratory arrest and died. *Id.*

The Ninth Circuit found that Stanard's Eighth Amendment claim was not meaningfully different from *Carlson*, rejecting several differences proffered by the defendants. First, the defendants argued that "the medical care [Stanard] received was less fragrantly deficient than in *Carlson*," and that "Stanard was merely denied 'the treatment he wanted on the schedule he preferred.'" *Id.* at 817. The court "disagree[d] that Stanard's claims amount[ed] to a mere scheduling preference," because "[d]elaying treatment is an established example of deliberate indifference to a serious medical need, in violation of the Eighth Amendment." *Id.* at 817 (citing *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). Additionally, the court reasoned:

> [E]ven assuming that Stanard received less deficient care than
> the inmate in *Carlson*, that difference in degree is not a
> meaningful difference giving rise to a new context. Stanard
> seeks a damages remedy for failure to provide medical attention
> evidencing deliberate indifference to serious medical needs.
> "Along every dimension the Supreme Court has identified as
> relevant to the inquiry," Stanard's case is a "replay" of *Carlson*.

*Id.* (quoting *Hicks v. Ferreyra*, 965 F.3d 302, 311 (4th Cir. 2020)).

Second, the *Stanard* defendants argued that, unlike in *Carlson*, Stanard was "challenging a broadly applicable BOP policy governing [Hepatitis C] treatment protocol in federal prisons, rather than a non-policy based pattern of neglect." *Id.* at 817. The court rejected this characterization of Stanard's claims, finding that he was "not simply challenging the constitutionality of a broadly applicable BOP policy," because he alleged that the defendants "exhibited deliberate indifference by ignoring his reports or inaccurately dismissing him as a pre-trial inmate." *Id.* at 817–18 (citing *Johnson v. Wright*, 412 F.3d 398, 404 (2d Cir. 2005)).

Finally, the *Stanard* defendants argued "that their conduct was not [a] 'serious enough' deprivation to support a claim for Eighth Amendment relief"; the Ninth Circuit "decline[d] to

17

reach the issue" because the "district court did not rule on the plausibility of Stanard's Eighth Amendment claim, choosing instead to rule only on *Bivens* liability." *Id.* at 817 n.3.

Here, Plaintiff alleged complete denial of some treatments ("Moore's course of treatment (none) and not putting the Plaintiff on restricted duty, or allowing him to receive his brace and denying him even anti-inflammatories . . ." (ECF No. 13 at 13)) and serious delay in others ("[a]fter a year and a half. . . , Moore finally sent the Plaintiff for an MRI but he annotated the incorrect knee . . . , so the MRI had to be rescheduled for months later" (ECF No. 13 at 14)). Plaintiff also alleged that Moore exhibited deliberate indifference by ignoring Plaintiff's request for diagnostic imaging, pain relief, knee brace, limited duty status, etc. (ECF No. 13 at 5).

In sum, as in *Stanard*, Plaintiff's case is not meaningfully different from *Carlson* and his Eighth Amendment claim does not arise in a new *Bivens* context. The Court does not find Defendant's argument to the contrary (ECF No. 58–2 at 14–17) persuasive.

Further, as in *Stanard*, because Plaintiff's Eighth Amendment claim arises within an existing context, the Court need not proceed to the special factors inquiry.

### 3.   Merits of Plaintiff's Eighth Amendment claim

#### a)   Legal Standard

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). This requires Plaintiff to show (1) "a 'serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) that "the defendant's response to the need was deliberately indifferent." *Id.* (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992)) (citation and internal quotations marks omitted), *overruled on other grounds by WMX Technologies v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (*en banc*).

Deliberate indifference is established only where the defendant *subjectively* "knows of and disregards an *excessive risk* to inmate health and safety." *Toguchi v. Chung*, 391 F.3d 1051,

1057 (9th Cir. 2004) (emphasis added) (citation and internal quotation marks omitted).

Deliberate indifference can be established "by showing (a) a purposeful act or failure to

respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference."

*Jett*, 439 F.3d at 1096 (citation omitted). Civil recklessness (failure "to act in the face of an

unjustifiably high risk of harm that is either known or so obvious that it should be known") is

insufficient to establish an Eighth Amendment violation. *Farmer v. Brennan*, 511 U.S. 825,

836–37 & n.5 (1994) (citations omitted).

A difference of opinion between an inmate and prison medical personnel—or between

medical professionals—regarding appropriate medical diagnosis and treatment is not enough to

establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989);

*Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004). Additionally, "a complaint that a

physician has been negligent in diagnosing or treating a medical condition does not state a valid

claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not

become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at

106. To establish a difference of opinion rising to the level of deliberate indifference, a

"plaintiff must show that the course of treatment the doctors chose was medically unacceptable

under the circumstances." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).

### b)   Undisputed Facts

The following relevant facts are undisputed:

- Plaintiff had two ACL reconstruction surgeries on his left knee before he arrived at FCI Mendota. Medical records show that the first surgery occurred in 2014, and the second on November 12, 2019. (ECF No. 60–1 at 1, #1);

- Plaintiff first arrived at FCI Mendota on January 29, 2020; then left for hearing on a federal writ on February 12, 2020, and returned to FCI Mendota on March 11, 2020. (ECF No. 49–2 at 2, ¶ 8; ECF No. 60–1 at 1–2, #2, #3);

- On his first arrival at FCI Mendota on January 29, 2020, Plaintiff was wearing a leg immobilizer. (ECF No. 60–1 at 1, #2; ECF No. 49–1 at 3, #15);

- Plaintiff faced a serious medical need. (ECF No. 49–1 at 1, #2);

- Defendant Moore was the doctor at Mendota FCI during the times relevant to the Plaintiff's incarceration. (ECF No. 49–1 at 2, #11);

- Plaintiff saw Dr. Moore three times: on April 2, 2020; July 2, 2020; and March 31, 2021. (ECF No. 60–1 at 2, #6; at 3, #8; 4, #13);

- During July 2, 2020 visit, Dr. Moore advised Plaintiff that he could not approve Plaintiff's request to allow a family member to send a knee brace with metal into the prison. (ECF No. 49–1 at 4, #20);

- On February 8, 2021, prison staff transported Gelazela from FCI Mendota to Saint Agnes Medical Foundation in Fresno for examination by orthopedic surgeon Ronald Castonguay, M.D. (ECF No. 60–1 at 4, #11);

- On February 10, 2021, Dr. Moore entered an Administrative Note acknowledging Dr. Castonguay's recommendation and requested an offsite MRI for Gelazela. In the note, Dr. Moore incorrectly noted the MRI was for the right knee, rather than the left. (ECF No. 60–1 at 4, #12);

- On March 31, 2021, Dr. Moore did amend Plaintiff's Medical Duty Status to include the restriction to sedentary work only. (ECF No. 60–1 at 5, #13);

- On May 5, 2021, prison staff transported Gelazela to Madera Community Hospital for an MRI, but the MRI was not completed that day because the authorization request [completed by Dr. Moore] indicated the right knee rather than the left. Dr. Moore entered a corrected request for an MRI on the left knee, and the MRI was completed less than one month later, on June 1, 2021. (ECF No. 60–1 at 5, #14);

- The report of the MRI [conducted on June 1, 2021] by Tony Ha, M.D., noted a "[h]igh-grade almost complete tear" of the previous ACL repair, a "[s]mall inferior tear of the lateral meniscus posterior horn," and a "[s]mall coronal orientated tear of the medial meniscus posterior horn." (ECF No. 60–1 at 5, #15);

- On June 17, 2021, sixteen days after the MRI, Gelazela was transported back to Saint Agnes Medical Foundation in Fresno for another examination by orthopedic surgeon Ronald Castonguay, M.D. (ECF No. 60–1 at 6, #17);

- Under "Physical Exam," Dr. Castonguay noted, "There are no changes on examination. MRI shows completed tearing of his ACL graft. There is tearing of the medial and lateral meniscus of which some may represent post-surgical changes." Dr. Castonguay wrote under "Assessment/Plan" the following: "I have given him the option of having a knee arthroscopy to address the meniscus but not the ACL given this would be a 3rd time reconstruction. He will be released fairly soon so he will wait until he is released in order to do this." (ECF No. 60–1 at 6, #18);

- On July 18, 2021, Plaintiff refused a nurse's recommendation of Amitriptyline 25 mg for knee pain, because Gelazela said he had side effects from the

medication. Two days later, Dr. Moore prescribed Duloxetine 30 mg as a new medication for Plaintiff's knee pain because he had declined Amitriptyline. (ECF No. 60–1 at 6–7, #20);

- The BOP has a Health Services National Formulary ("Formulary") which is a list of medications that are considered by the BOP's professional staff to ensure high quality, cost-effective drug therapy for the inmate population. The BOP Formulary contains a Formulary OTC [Over the Counter] Prescribing Criteria Matrix, which governs the dispensing of OTC medications. The prescribing of medications against the restrictions is considered an unauthorized use of government funds. (ECF No. 60–1 at 7, #22);

- On September 14, 2021, Plaintiff transferred out of FCI Mendota to prerelease custody. (ECF No. 60–1 at 7, #21);

### c)  Deliberate Indifference

Because the parties do not dispute that Plaintiff had a serious medical need (ECF No. 49–1 at 1, #2), the Court next turns to whether Plaintiff submitted evidence that Defendant Moore was deliberately indifferent to his serious medical need. Plaintiff asserts that Defendant Dr. Moore was deliberately indifferent to Plaintiff's medical needs in the following ways:

1) Moore refused to issue the necessary form for the Plaintiff to receive an additional knee brace;

2) Dr. Moore refused to send the Plaintiff out for an MRI despite the Plaintiff's repeated requests;

3) When Plaintiff was finally sent for an MRI, the setback caused by Dr. Moore directing the MRI to be done on the wrong knee on the authorization request "delayed the Plaintiff's exam just long enough to push his window for surgery outside of the end of his incarceration,"

4) Dr. Moore denied him even anti-inflammatories;

5) Dr. Moore refused to put Plaintiff on limited duty status;

6) Over the course of year and a half, Moore refused to provide Plaintiff with any care for Plaintiff's knee;

(ECF No. 45–2 at 12–13, 20; ECF No. 13 at 13–14). Each assertion is addressed below.

21

### (i)   Knee brace

*Estelle* instructs that prison officials act with deliberate indifference when they "intentionally interfer[e] with . . . treatment once prescribed." 429 U.S. at 104–05. Following *Estelle*, the Ninth Circuit has held that a prison official acts with deliberate indifference when he ignores the instructions of the prisoner's treating physician or surgeon. *See, e.g.*, *Wakefield v. Thompson*, 177 F.3d 1160, 1165 (9th Cir. 1999); *Hamilton v. Endell*, 981 F.2d 1062, 1066 (9th Cir. 1992).

Plaintiff argues that in refusing to sign authorization for a different knee brace than the one Plaintiff was already using in July of 2000, Defendant Moore ignored the instructions of Plaintiff's treating surgeon, thus acting with deliberate indifference.

The parties agree that Plaintiff arrived at FCI Mendota in January of 2000 in a leg immobilizer (knee brace) and Plaintiff states that he retained this brace "the entire time he was incarcerated there." (ECF No. 45–1 at 1, ¶ 1). BOP Health Services record for Devices and Equipment confirm that Plaintiff was authorized to have a knee brace starting on January 15, 2020, with no end date entered. (ECF No. 45–7 at 18). Plaintiff argues, however, that

> Plaintiff was to stop wearing the heavy, restrictive knee brace *per his surgical doctor's orders* after three months (this is written in the surgeon's letter—see REB EXHIBIT G), as his doctor said it could become counterproductive to healing and "range of motion" to continue to wear that particular brace after three months. It was supposed to then be replaced by another form-fitting brace that the Plaintiff tried to have mailed in but was refused the form.

(ECF No. 45–2 at 11 n.4) (emphasis added). Plaintiff alleged in his complaint that "Plaintiff had the right to receive his VA appointed surgeon's proscribed medical device." (ECF No. 13 at 12). As Plaintiff reiterates in his motion, Plaintiff also alleged in his complaint that Defendant Moore "refused to issue the necessary form for the Plaintiff to receive (via the mail) his additional form-fitting, specialized knee brace that was supposed to replace his old knee brace after three months *per his surgeon's orders*." (ECF No. 45–2 at 11–12) (emphasis added)

(citing ECF No. 13 at 5 and "Exhibit G"); *see also* Plaintiff's Response to Defendant's Statement of Undisputed Facts: "Defendant falsely implies that 2nd brace was not prescribed by the Plaintiff's surgeon as critical follow-up care from his second surgery." (ECF No. 60–1 at 3, #8); In his opposition to Defendant Moore's motion for summary judgment, Plaintiff continues to insist "This was not just some 'different knee brace' (MSJ, 58–2, pg. 3, ln. 8), it was ordered by the Plaintiff's surgeon as a critical part of the recovery process." (ECF No. 60 at 3).

In support of this argument, Plaintiff relies on a letter dated December 16, 2019, on Keck School of Medicine of USC letterhead, with the name of the doctor redacted. (ECF No. 45–5 at 39). The letter states as follows:

> To whom it may concern,
>
> Mr. Mark Alan Gelazela had ACL reconstructive surgery on November 12th, 2019 here at Keck medical center. He is to be on crutches for a period of 3 weeks and is to be wearing the dop-lock [sic] brace provided for a period of at least 3 weeks, at which time it may be unlocked to provide motion. He should wear this brace at all times for at least a period of 3 months (except while sleeping), and should not engage in any strenuous activity of any kind (bending, twisting, turning, lifting, jogging, running or otherwise) for a period of at least 6 months. After this period, Mr. Gelazela can engage in light physical activity, but at all times, should be wearing the brace provided for support for his knee. Failure to follow these instructions may result in the failure of the reconstructed knee and the new ACL. This is the second time I have performed this surgery on Mr. Gelazela, and these instruct ions are very important for a successful outcome.

(ECF No. 45–5 at 39).

However, this letter does not support Plaintiff's argument. Nothing in this letter or any other piece of evidence supports Plaintiff's argument that his surgeon ordered the brace Plaintiff brought with him to FCI Mendota to be replaced by a different one after three months. There are no references in the surgeon's letter to a new, form-fitting brace or any other

replacement brace required after three months. (ECF No. 45–5 at 39). It appears that no brace is needed at all after about six months. (*Id.*)

According to the evidence presented, Plaintiff asked Dr. Moore to approve a knee brace "sent in from family" during his July 2, 2020 visit,[3] or nearly eight months after the surgery. (P MSJ, Exhibit C Exhibit G-24, ECF No. 45–5 at 27). This is long past the period of time that Plaintiff was supposed to stop wearing the knee brace altogether. At most, Plaintiff established he wanted a different knee brace, even though he was still allowed to use the one his surgeon sent with him. Thus, at most, Plaintiff's evidence shows a difference of opinion concerning a course of medical treatment. However, a mere "difference of medical opinion . . . [is] insufficient, as a matter of law, to establish deliberate indifference." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).

### (ii)   Refusal to send Plaintiff for MRI

Next, Plaintiff contends that Dr. Moore was deliberately indifferent to his serious medical need when he ignored his requests to be sent out for an MRI.

Dr. Moore referred Plaintiff for an MRI on February 10, 2021, two days after Plaintiff saw an orthopedic surgeon, Dr. Castonguay, on February 8, 2021. (ECF No. 49–2 at 6). Therefore, the question before the Court is whether Dr. Moore was deliberately indifferent to Plaintiff's serious medical need by not referring Plaintiff for an MRI at the April 2, 2020 and July 2, 2020 visits.

Relying on the medical records, Dr. Moore asserts that on April 2, 2020, he saw Plaintiff and advised him that "he had a consultation requesting pending to see an outside orthopedist," but Dr. Moore could not tell Plaintiff a certain date when the appointment would occur. (ECF No. 49–2 at 5, 38). Dr. Moore advised Plaintiff that due to the coronavirus

---

[3] This July 2, 2020 visit appears to be the first and only time that Plaintiff made a request for a different knee brace to Dr. Moore. Subsequent demands for a different knee brace were made in grievance forms and emails that were directed to others, such as to the Court on December 13, 2020 in a habeas petition (ECF No. 45-7 at 4), to Warden on July 13, 2020 in a BP-8 form (ECF No. 45-7 at 11), or to "Howard in Medical" on September 8, 2020, also on a BP-8 form. (P MSJ, Exhibit C Exhibit F, ECF No. 45–5 at 14).

pandemic, "inmates were not being transported into the community for routine or non-emergent health issues." (ECF No. 49–2 at 5, 38). Dr. Moore also acknowledges that Plaintiff

> did have some delay in obtaining outside care, in large part due
> to the coronavirus pandemic. The pandemic created significant
> safety and staffing challenges for the BOP due to the high risk
> of COVID-19 spread among staff and inmates once it is
> introduced into a correctional facility. The BOP implemented
> modified operations intended to help mitigate the spread of
> COVID-19, including at times suspending inmates' in-person
> visits, canceling staff travel and training, restricting contractors'
> and volunteers' access to BOP facilities, and requiring Wardens
> to modify operations to maximize social distancing. Non-
> emergent travel to outside medical facilities was heavily
> curtailed during this period.

(ECF No. 49–2 at 8, ¶ 38).

In his opposition, Plaintiff argues that "At no time ever, including this April 2, 2020 visit, did Moore ever 'advise[d] Gelazela that due to the coronavirus pandemic, inmates were not being transported into the community for routine or non-emergent health issues' . . . this is pure fabrication on the part of Moore . . . ." (ECF No. 60 at 6). Likewise, in responding to Defendant's Undisputed Fact in reference to April 2, 2020 visit, Plaintiff asserts that "Moore never advised COVID excuse." (ECF No. 60–1 at 3, #6).

Based on the Court's review of the medical records, the evidence supports Defendant Moore's position. On July 13, 2020, in BP-8 to the Warden, Plaintiff wrote, "[Dr. Moore] finally responded to one of my sick call requests (around April 2nd) to inform me of this appointment (scheduled for April 4th) but, in the same breath, he also informed me that I could not go to the appointment due to the Chinese virus lockdown." (P MSJ, Exhibit C Exhibit A1, ECF No. 45–5 at 10). On September 28, 2020, Plaintiff sent a message to Health Services, "inquiring about [his] ortho appt that was scheduled on April 4th but then postponed due to covid. . . . Is there any discernable time in the future when I can see an orthologist?" (P MSJ, Ex. REB W, ECF No. 45–14 at 16). The next day Plaintiff received a response, "Your orthopedic consult has received priority. Unfortunately, we are subject to the effects of the

pandemic in the local community and the entire nation. You are scheduled to see the Orthopedist on his first available appointment." (*Id.*) Plaintiff responded on November 20, 2020: "I requested a ortho for my disabled, freshly operated on knee in January, but it took till April to get an appointment that I was then not allowed to attend due to covid excuses." (*Id.* at 17). Finally, in drafting petition for habeas to this Court on December 13, 2020, Plaintiff asserted, "They will not send me out to be diagnosed for the aforementioned issues because of the Chinese virus." (P MSJ, Ex. REB P, ECF No. 45–7 at 6, Ground Two of the habeas petition).

Several courts have held that a delay in dental or medical procedures due to COVID-19 concerns is neither arbitrary nor was for a "non-medical reason." *See, e.g.*, *Thompson v. Williams*, 2022 WL 714691, at *3 (D. Colo. Mar. 10, 2022) (treatment delay due to COVID restrictions was not a "non-medical" delay); *Johnson v. Montag*, No. CV 2–186, 2023 WL 5621355, at *1 (W.D. Pa. Aug. 31, 2023) ("The Court finds no error with the Magistrate Judge's finding that any delay in Plaintiff's dental treatment caused by the DOC's COVID-19 policy was neither arbitrary nor for a 'non-medical reason.'"); *Cheatham v. Dedeke*, 2022 WL 17093046, at *4 (D. Kan. Nov. 21, 2022) (delay in treatment because of COVID quarantine does not rise to the level of a constitutional violation); *Jones v. Sorbu*, 2021 WL 365853, at *6 (E.D. Pa. Feb. 3, 2021) (holding delay in prison dental procedures due to COVID-19 restrictions was neither arbitrary nor for a "non-medical" reason).

Therefore, Plaintiff fails to raise a material issue of fact on this issue as well.

### (iii) Delay caused by identifying the wrong knee for MRI

Plaintiff also argues that the delay in obtaining an MRI of about three weeks, from May 5th, 2021 to June 1, 2021, caused by Dr. Moore specifying the wrong knee on which to do the scan, "delayed the Plaintiff's exam just long enough to push his window for surgery outside of the end of his incarceration, all of which further damaged his knee and extended his suffering." (P MSJ, ECF No. 45–2 at 13). Specifically, Dr. Castonguay offered him "the option of having a knee arthroscopy to address the meniscus (ECF No. 49–2 at 8) but that the surgery "would not happen for 3 months" and by then, Plaintiff "would be already released from incarceration . . .

26

(he was released from custody just 2.5 months later)." (P MSJ, ECF No. 45–2 at 14). Defendant responds that, "[a]lthough Dr. Moore did indicate the wrong knee in his initial request for approval of the MRI, the result of this error was a delay of less than one month, and there is no evidence that such delay was the cause of any injury to Gelazela." (ECF No. 49 at 12) (citing ECF No. 49–2 at ¶ 40).

But Plaintiff neither alleged nor introduced any evidence that when Dr. Moore ordered the scan in February of 2021, he knew that Plaintiff would be released to home confinement soon, knew that home confinement would delay the surgery, and deliberately ordered the scan on the wrong knee to delay the surgery. At most, ordering an MRI on the wrong knee amounts to negligence or medical malpractice, which will not support deliberate indifference claim. *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (internal citation omitted); *see also Estelle*, 429 U.S. at 106 ("a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.").

### (iv)  Denial of anti-inflammatories;

Plaintiff alleges that Dr. Moore denied him even anti-inflammatory medication: Dr. Moore "refused to issue even something as simple as ibuprofen." (ECF No. 13 at 5, 13). The "denial" appears to be a referral to purchase ibuprofen and other over-the-counter medications from the commissary. (P MSJ, ECF No. 45–2 at 9). Plaintiff alleges that his pain level was beyond ibuprofen, however. (*Id.* at 9–10). Plaintiff goes even further, however, claiming that "did not have any money with which to purchase the 'recommended medications' from the commissary (most incarcerated people do not), and so it was, de facto, a denial of medicine." (*Id.*) Defendant responds that "Dr. Moore and his staff informed Gelazela how to obtain medications from the commissary if needed and prescribed medication when appropriate under the BOP's medication Formulary." (ECF No. 49 at 11) (citing Dr. Moore's declaration, ECF No. 49–2 at ¶¶ 11–12, 42–43).

Plaintiff has not introduced any evidence or even alleged that Dr. Moore knew that Plaintiff lacked funds to purchase medications. *Shapley v. Nevada Bd. of State Prison*

*Comm'rs*, 766 F.2d 404, 408 (9th Cir. 1985) (absent allegation that prisoner cannot afford to pay medical fee, prison's policy of charging a fee for medical treatment did not constitute deliberate indifference); *see also Emil v. Crawford*, 125 F. App'x 112, 112–13 (9th Cir. 2005) (charging prisoner for prescription drugs does not constitute cruel and unusual punishment); *cf. Keller v. Faecher*, 44 F. App'x 828, 831 (9th Cir. 2002) (prisoner alleged deliberate indifference when physician recommended over-the-counter medication he knew prisoner might lack the funds to purchase).[4]

As to Plaintiff's representation that he needed something stronger than ibuprofen, the evidence he submitted states that he specifically requested ibuprofen. (P MSJ, Ex. A1, ECF No. 45–7, at 12). After Plaintiff declined surgery, he was given prescription medication, which he also declined. (ECF No. 49–2 ¶ 33). Two days later, however, Dr. Moore prescribed him a different medication to manage him pain. (*Id.* ¶ 34).

For these reasons, Plaintiff has not raised a genuine issue of material fact that Dr. Moore was deliberately indifferent to Plaintiff's serious medical need by directing Plaintiff to purchase ibuprofen through the commissary.

**(v)  Limited duty status and other accommodations;**

Plaintiff accuses Dr. Moore of "refus[ing] him limited duty or lower bunk for over a year," (P MSJ ECF No. 45–2 at 19). However, Plaintiff has not alleged or presented evidence that he requested those accommodations from Dr. Moore at either April or July 2020 visit. When Plaintiff asked for these accommodations during his March 31, 2021 visit, Dr. Moore immediately amended Plaintiff's Medical Duty Status to include the restrictions to a cell on the first floor, lower bunk, with sedentary work only. (ECF No. 49–2 at 7, 49). It appears that some of these accommodations were entered at the initial screening when Plaintiff first arrived at FCI Mendota, but then expired while Plaintiff was out at a hearing before he returned. It seems that Dr. Moore believed that some of these accommodations remained in effect, as evidenced by his

---

[4] Moreover, according to the evidence in the record, it appears Plaintiff was able to obtain the medication: Plaintiff wrote to the Warden that after he was "denied" ibuprofen, he "bought copious amounts through the 'commissary.'" (P MSJ, Ex. A, ECF No. 45–7 at 12).

February 4, 2021 response from Plaintiff for lower bunk accommodation: "already has bottom bunk pass." (ECF No. 49–2 at 42). And confusion over what accommodations were currently in effect, like negligence or malpractice, does not rise to the level of deliberate indifference, especially considering that Dr. Moore entered the requested accommodations for lower bunk and sedentary duty at the next visit.

Additionally, without citation to evidence, Plaintiff takes an issue with Dr. Moore denying a "soft shoe pass," (ECF No. 45–2 at 19), yet does not explain what the pass is, why it was required to address his medical need, or how it was medically unacceptable for Dr. Moore not to issue one.

### (vi)  Refusal to provide any care

Plaintiff insists that he received "no care" for his knee. *See, e.g.*, (ECF No. 45–2 at 12 n.5, 20; ECF No. 45–14 at 11; ECF No. 45–5 at 10, etc.) As a result, he argues, his injury became permanent, and he, "a cripple." (ECF No. 45–14 at 47). Plaintiff relies on MRI as evidence of his suffering: "the eventual MRI showed that the Plaintiff was indeed very injured, and was certainly in great pain, and this pain was expressed much earlier not only verbally but in writing." (ECF No. 45–2 at 20).

However, the record shows that Plaintiff was seen multiple times by numerous medical staff. As soon as BOP started sending out inmates again following the COVID outbreak, Plaintiff was seen by a specialist and had x-rays taken. He then was sent for additional imaging and offered surgery, which he declined. Plaintiff was given work and housing accommodations as well as prescription pain medication; after he informed medical staff that he had bad reaction to that medication, he was prescribed a different one.

Plaintiff ascribes a sinister motive to these later actions: "once the later MRI in June made it clear that the Plaintiff's knee was MUCH worse than the orthopedist suspected . . . , the defendant than issued pain medication and made the limited duty pass enforceable by now translating it to the Plaintiff's inmate case file, all again in a willful attempt to try and artificially mitigate his liability." (P MSJ ECF No. 45–2 at 9 n.2).

However, it is not deliberate indifference to change a medical plan after receiving new medical information. The MRI scan in June of 2021 showed additional injuries, which Dr. Moore addressed.

While Plaintiff—with the benefit of hindsight—faults Dr. Moore, there are no allegations or evidence that Dr. Moore actually knew that Plaintiff had ACL or meniscus tears before the scan. After all, even an orthopedic surgeon, after x-rays and physically examining Plaintiff, until receiving the June 2021 MRI results believed that ACL was intact and needed an MRI to rule out the meniscus tear. (ECF No. 49–2 at 43).

For the foregoing reasons, the Court recommends finding that Plaintiff has failed to raise a dispute of fact that Dr. Moore was deliberately indifferent to Plaintiff's serious medical need. Accordingly, Dr. Moore is entitled to summary judgment on Plaintiff's Eighth Amendment claim against him.[5]

## III.   CONCLUSION AND ORDER

Based on the foregoing, **IT IS ORDERED:**

1. Plaintiff's motions for leave to file surreplies (ECF No. 55, 62) are **DENIED**.

In addition, it is also **RECOMMENDED** that:

1. Plaintiff's Motion for Summary Judgment (ECF No. 45) be **DENIED**;

2. Motion for Summary Judgment by Defendant United States of America (ECF No. 48) be **GRANTED**;

3. Motion for Summary Judgment by Defendant Moore (ECF No. 58) be **GRANTED**;

4. All of other motions be terminated and deadlines vacated, and the Clerk of Court be directed to close this case.

These findings and recommendations are submitted to the United States district judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within thirty

---

[5] Given the Court's recommendation on this element on the claim, the Court declines to address Defendants' remaining arguments why summary judgment should be granted.

days after being served with these findings and recommendations, any party may file written objections with the court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 838–39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **August 5, 2024**                          /s/ Erica P. Grosjean

UNITED STATES MAGISTRATE JUDGE

31